SUN MICROSYSTEMS INC., Plaintiff,

v.

HYNIX SEMICONDUCTOR INC., et al., Defendants.

No. C 06–1665 PJH.

United States District Court, N.D. California.

March 31, 2009.

---

Christine Elaine Cwiertny, Daniel Allen Sasse, Theresa C. Lopez, Crowell & Moring LLP, Irvine, CA, David Daniel Cross, Jerome A. Murphy, Kathryn D. Kirmayer, Kent A. Gardiner, Matthew J. McBurney, Jeffrey H. Howard, Crowell & Moring LLP, Washington, DC, for Plaintiff.

Kenneth Ryan O'Rourke, Steven H. Bergman, Paul Benedict Salvaty, O'Melveny & Myers LLP, Los Angeles, CA, Cathy Yunshan Lui, Howard Mark Ullman, Orrick, Herrington & Sutcliffe LLP, San Francisco, CA, Na'il Benjamin, Robert E. Freitas, Orrick Herrington & Sutcliffe LLP, Menlo Park, CA, for Defendants.

**ORDER GRANTING MOTION TO DISMISS; DENYING MOTION TO EXCLUDE; AND GRANTING SUMMARY JUDGMENT IN PART AND DENYING SUMMARY JUDGMENT IN PART**

PHYLLIS J. HAMILTON, District Judge.

Defendants' motion to dismiss, motion to exclude expert testimony, and motions for summary judgment came on for hearing on December 17, 2008 and January 21, 2009 before this court. Plaintiff Sun Microsystems, Inc. ("Sun" or "plaintiff"), appeared through its counsel, Kathryn D. Kirmayer, Jerome A. Murphy, David D. Cross, and Jeffrey Howard. Defendants[1] appeared through their counsel, Paul Salvaty, Steven H. Bergman, Kenneth

---

1. Although this action was originally brought against numerous defendant entities, several of the defendants have since been dismissed, or filed withdrawals. Those defendant entities who currently remain in the case and bring the current motions are: Hynix Semiconductor, Inc., and Hynix Semiconductor America, Inc. (collectively "Hynix"); Nanya Technology Corporation, and Nanya Technology Corporation USA ("NTC" and "NTC USA," respectively).

O'Rourke, Michael Tubach, Tim Martin, Julian Brew, Harrison Frahn, Howard Ullman, Catherine Lui, Jonathan Swartz, Robert Pringle, Joel Sanders, Joshua Hess, and Robert E. Freitas. Having read all the papers submitted and carefully considered the relevant legal authority, the court hereby GRANTS defendants' motion to dismiss, DENIES defendants' motion to exclude, and GRANTS the motions for summary judgment in part and DENIES the motions for summary judgment in part, for the reasons stated at the hearing, and as follows.

## BACKGROUND

Plaintiff is part of the general opt-out category of cases that is related to *In re Dynamic Random Access Memory (DRAM) Antitrust Litigation,* Case No. M 02–1486 PJH—a multidistrict litigation ("MDL") action currently pending before the court. Both the MDL action and the opt-out cases generally allege a horizontal price-fixing conspiracy carried out by numerous DRAM manufacturer defendants, in violation of federal and state antitrust laws. While there are a total of six different individual cases that form a part of the opt-out category of cases, only *Sun Microsystems, Inc. v. Hynix Semiconductor, et. al.* is currently at issue.

### A. General Background

Sun is an original equipment manufacturer ("OEM") involved in the technology field. It is a leading maker of computer servers and workstations, among other items. In the operative amended consolidated complaint ("ACC"), Sun alleges that from 1997 through 2002 several manufacturer defendants ("defendants") engaged in a conspiracy to control DRAM production capacity, raise DRAM prices, allocate customers, and otherwise unlawfully overcharge their DRAM customers. *See, e.g.,* ACC ¶¶ 21, 23, 25, 27, 29, 31, & 34 (alleging that foreign defendants "manipulated the price of DRAM charged around the globe"). As a result, plaintiff alleges that, as a large purchaser of defendants' DRAM, it suffered injury in that it paid more for DRAM than it otherwise would have in the absence of defendants' conspiracy.

To that end, Sun asserts three causes of action against defendants: (1) violation of the Sherman Act pursuant to 15 U.S.C. § 1; (2) violation of California's Cartwright Act pursuant to §§ 16700 et seq. of the Cal. Bus. & Prof.Code; and (3) violation of California's Unfair Competition Act pursuant to §§ 17200 et seq. of the Cal. Bus. & Prof.Code. *See* ACC, ¶¶ 79–106. Sun seeks damages as a result of the artificially inflated prices it allegedly paid for DRAM as a consequence of defendants' alleged price-fixing activity.

### B. Facts Regarding Sun's DRAM Procurement

Sun manufactures and sells its servers and workstations both domestically and abroad. To aid in this process, Sun outsources a portion of its server and workstation assembly to a network of domestic and foreign entities comprised of (1) third-party external manufacturers and (2) Sun's corporate subsidiaries. Of particular relevance here is Sun's relationship with these two entity groups vis-a-vis a critical component of the manufacturing process—the purchase of DRAM on Sun's behalf, for incorporation into final Sun products.

#### 1. Third-party External Manufacturers

The ACC alleges that approximately 34% of the DRAM purchases at issue here were made by third-party external manufacturers ("EMs").[2] *See* ACC ¶ 13b. The

---

**2.** Notwithstanding the ACC's allegation, there is a dispute between the parties as to the

actual amount and percentage of DRAM purchases made by third-party external manufac-

EMs were and are independent business entities located both domestically and abroad. *See id.* Sun does not share common ownership with any of the EMs; it does not own any controlling share of any EM, has none of the same board of directors or officers as any EM, and does not commingle funds or share corporate books and records with any EM. *See* Declaration of Angela M. Moore ISO MSJ re External Manuf. Purch. ("Moore Decl. Re EMs"), Ex. 5 at 10; Bergman Decl., Ex. 2 at Response 5, Ex. 3 at Response 50, Ex. 4 at Responses 42–45. The EMs at issue in this case include, for example, Celestica, Solectron Corporation, MiTac International Corporation, Smart Modular Technologies, Inc., Benchmark Electronics, Inc., and Expansion Electronics, Inc. *See, e.g.,* Declaration of Steven Bergman ISO Mot. Dismiss ("Bergman Decl."), Exs. 18–21. Sun charged the EMs, in part, with purchasing DRAM directly from defendants and other suppliers, in order to incorporate that DRAM into the manufacture of Sun-designed and Sun-branded products that were to be sold back to Sun (for retail sale by Sun).

Sun's relationship with the relevant EMS was formalized in Master External Manufacturing Agreements ("MEMAs"). All the MEMAs at issue here have effective dates that post-date 1997. *See* Declaration of Jason M. Bussey ("Bussey Decl. Re. EMs"), Ex. A; Moore Decl. Re EMs, Exs. 24–26; *see also* Bergman Decl., Exs. 18–21. Pursuant to the terms of the MEMAs, the EMs were considered "independent contractors" and were expressly prohibited from "act[ing] in a manner which expresses or implies a relationship other than that of independent contractor, [or]

bind[s] the other party." Moore Decl. Re EMs, Exs. 24, ¶ 8.5; Ex. 25, ¶ 8.5; Ex. 26, ¶ 26.3; Bussey Decl. Re. EMs, Ex. A, ¶ 28.4.

Sun's relationship with its EMs was multi-tiered. As an initial matter, once an EM executed a MEMA with Sun, Sun's practice was to issue an award letter to the EM. *See* Moore Decl. Re EMs, Ex. 7 at 61, 76–77. The award letter set the price at which Sun would buy a particular DRAM-containing product from the EM, and identified quality standards for the product. *See id.* Subsequently, Sun also communicated its supply plan to the EM, informing the EM how much demand for DRAM-containing products Sun forecasted in the coming quarters. *See* Moore Decl. Re EMs, Ex. 7 at 76. Notably, however, Sun's forecast was fluid and was frequently updated. Sun also did not commit to actually purchasing a set quantity of DRAM-containing products in its forecasts, nor did it always end up purchasing all products forecasted. *See id.* at 82–83.

After receiving Sun's supply forecasts, EMs then purchased DRAM from suppliers in order to meet the demand forecasted in the supply plan. *Id.* at 76–77. As part of this process, Sun would preliminarily generally determine which DRAM suppliers were qualified to sell DRAM to the EMs for use in Sun products, and would furthermore generally negotiate DRAM pricing between the EMs and DRAM suppliers. *See* Declaration of David C. Cross ISO EM Opp. ("Cross EM Opp. Decl."), Ex. 26 at 160; Ex. 27 at 128–29; Ex. 22 at 82–83, 613; Ex. 28 at 62–64; Ex. 29 at 119–122, 124 (generally discussing Sun's creation of an approved vendor list for use

---

turers. Using the 34% alleged in the complaint and plaintiff's own expert report as to damages, defendants contend that there are $1.05 billion in DRAM purchases made by external manufacturers at issue in the case. *See* Def. MSJ re Ext. Manuf. Purch. at 4:8–11.

Plaintiff, however, contends in their opposition that external manufacturer purchases amount to approximately $179 million worth of DRAM purchases, or around 6% of Sun's total DRAM purchases. *See* Pl. Opp. Re MSJ re Ext. Manuf. Purch. at 1:5–6.

by the EMs). Sun's global memory procurement team in California, for example, dictated a single worldwide price at which the EMs were permitted to order DRAM from DRAM suppliers for incorporation into Sun products, and further awarded a specific share of business to each DRAM supplier. *See* Cross EM Opp. Decl., Ex 29 at 28–29, 134–35; Ex. 30 at 125–26; Ex. 28 at 71–72; Ex. 31 at 57–58. Each EM would then be told from whom, at what price, and at which percentage of business they should issue purchase orders for the DRAM to be used in Sun products. *See, e.g.,* Cross EM Opp. Decl., Ex. 32 at 45–50; Ex. 29 at 28–29, 134–45; Ex. 30 at 125–26. In some instances, Sun even required the EMs to purchase DRAM from Sun's own inventory. *See* Cross EM Opp. Decl., Exs. 37–39. Either way, however, the EMs were expected to, and generally did, execute purchase orders for DRAM pursuant to the directions provided by Sun. *See, e.g., id.* at Ex. 24 at 61; Ex. 53; Ex. 54 at 111–112.

Nonetheless, there is evidence that at times, some of the EMs independently selected DRAM suppliers from whom to purchase DRAM, and independently negotiated DRAM pricing with those DRAM suppliers. *See, e.g.,* Moore Decl. Re EMs, Ex. 7 at 206–09 (MiTac); Ex. 13 at 116–18 (Celestica); Ex. 21 (MiTac); *see also* Bergman Decl., Ex. 9 at 216–21; Ex. 21 at SUN001236; Ex. 31.

After DRAM pricing and suppliers were determined—either by Sun, or the EMs acting independently—the EMs procured the DRAM. The EMs did so by: issuing purchase orders; receiving invoices issued by the DRAM suppliers; paying the invoices sent to them by the DRAM suppliers; and taking receipt of the actual DRAM purchased from the suppliers. *See*

Moore Decl. Re EMs, Ex. 7 at 87; Ex. 13 at 45–46; Ex. 8 at 60–62; Ex. 5 at 10:22–13:1. After accepting delivery of the DRAM from the defendant suppliers, the EMs took title to it. *See id.* at Ex. 9 at 610–11; Ex. 8 at 66, 72; Ex. 13 at 47; Ex. 14 at 114; Ex. 12 at 32–33, 55–56. The EMs generally retained title until Sun accepted an assembled DRAM-containing product from the EMs. As some of the EMs testified, as a result of taking title, the EMs accepted the risk of loss and damage to the DRAM, and would bear the cost of replacement for damaged DRAM. *See id.* at Ex. 7 at 117; Ex. 9 at 610–11; Ex. 13 at 69–74, 77–78.[3]

As for the DRAM that was delivered to, but not ultimately used by the EMs (as a result of a change in Sun's forecasts or the end of life of a particular Sun product, for example), the EMs often made efforts to return the excess to DRAM suppliers or to transfer it to another of Sun's EMs at Sun's direction. However, if these efforts were unsuccessful, Sun generally bore the cost of this DRAM and bought it back from the EMs. *See id.* at Ex. 28 at 53–54; Ex. 29 at 74, 94; Ex. 65 at 38–39; Ex. 30 at 34–35, 79–80, 90–94. The EMs were not permitted to sell excess DRAM to third parties without prior approval from Sun. *Id.* at Ex. 28 at 54; Ex. 29 at 76–77, 191–92.

Finally, having purchased DRAM from DRAM suppliers for use in the manufacture of DRAM-containing products on Sun's behalf, the last step of the distribution chain involved a downstream transaction in which Sun purchased the finished DRAM-containing products from the EMs. To do so, Sun issued purchase orders for products on a quarterly or semi-quarterly basis. Sun purchased DRAM-containing

---

**3.** On many occasions, the DRAM suppliers kept track of which DRAM delivered to the EMs was intended for use in Sun products. In these instances, the suppliers' sales records identified Sun as the end-purchaser. *See, e.g.,* Cross EM Opp. Decl., Exs. 1–19.

products from the EMs at cost plus a percentage markup. *See id.* at Ex. 7 at 217–18; *see also* ACC ¶¶ 13a-b.

### 2. Sun's Foreign Subsidiaries

The ACC alleges that approximately 66% of the DRAM used by Sun in its finished products was purchased by and delivered to Sun's own manufacturing facilities located in the United States and abroad. *See* ACC ¶ 13a. Sun further alleges that 25% of this DRAM was delivered to and purchased specifically by Sun's foreign manufacturing facilities located in Europe—primarily Sun Microsystems Scotland ("Sun Scotland"), which manufactures servers and workstations in Linlithgow, Scotland, and Sun Microsystems International B.V. ("Sun Netherlands"), which distributes and markets Sun servers and workstations in Europe and other foreign markets. *See id.*

Sun Scotland and Sun Netherlands are indirect, wholly owned subsidiaries of Sun. The subsidiaries do not share the identical board of directors and officers with Sun, although they do have some common directors and officers. *See* Bergman Decl., Ex. 4 at Responses 4–5, 23–25. Nor do Sun's directors form a majority of the subsidiaries' boards of directors. *See id.* at Responses 6, 26.

The procurement process vis-a-vis Sun's foreign subsidiaries largely paralleled that of the third-party external manufacturers. As with the external manufacturers, for example, Sun's global procurement team based in California established a single worldwide price at which the subsidiaries were permitted to order DRAM from DRAM suppliers, for delivery in turn to Sun's subsidiaries. *See generally* Declaration of David C. Cross ISO FTAIA Opp. ("Cross FTAIA Opp. Decl."), Ex. 3.[4] Specifically, Sun's global procurement team utilized face-to-face negotiations, live auctions called Dynamic Bidding Events ("DBEs"), and sealed bidding events in order to establish the worldwide DRAM price and choose those DRAM suppliers from whom Sun's subsidiaries then purchased DRAM for use in manufacturing Sun products. *See* Cross FTAIA Opp. Decl., Ex. 5 at 21–23, 28–29, 31, 47–48, 50.

After DRAM pricing and supplier determinations had been made, and in purchasing DRAM from approved suppliers (many of whom were European entities) pursuant to the worldwide price, Sun Scotland and Sun Netherlands also issued their own purchase orders to suppliers; took delivery of DRAM from the suppliers; were directly invoiced for the DRAM; and settled and/or paid the invoices from the suppliers. *See* Bergman Decl., Ex. 4 at Responses 16, 35; Ex. 5 at Responses 17–19, 36–38. However, when issues arose with DRAM purchased by Sun's foreign subsidiaries or with respect to the subsidiaries' relationships with suppliers, the California-based global procurement team generally addressed those issues. *See, e.g.,* Cross FTAIA Opp. Decl., Exs. 10–11; *see also id.,* Ex. 3 at ¶ 8.

There is evidence that the DRAM purchases made by Sun's foreign subsidiaries were used in the manufacture of finished Sun products at Sun's foreign facilities, which products were in turn sold to customers in Europe and elsewhere. *See, e.g.,* Bergman Decl., Ex. 7 at 23–24 (discussing manufacture and sale of DRAM-containing Sun products at Sun Scotland).

### C. Procedural Case History

To date, the court has had occasion to rule on two separate motions to dismiss in

---

**4.** The "single worldwide DRAM price" established by Sun's California-based global procurement team applied equally to Sun's foreign subsidiaries and its third-party external manufacturers. *See id.* at ¶ 5.

this case. First, on March 7, 2007, the court heard defendants' motion to dismiss certain claims asserted in the original consolidated complaint in the Sun action, on grounds that the court lacked subject matter jurisdiction. Specifically, defendants had moved to dismiss plaintiff's claims to the extent they were based on foreign DRAM purchases made by Sun's external manufacturers and foreign affiliates on Sun's behalf, arguing that such claims were premised on unrecoverable foreign injury only. The court granted defendants' motion to dismiss, but because of the complaint's lack of clarity with respect to the nature of any claims based on foreign DRAM purchases, granted Sun leave to amend in order to set forth allegations that provided greater clarity and specificity with respect to that portion of plaintiffs' claims allegedly based on foreign harm, as distinct from that portion based on domestic harm.

Plaintiff filed the amended consolidated complaint on May 4, 2007, and subsequent to that filing, defendants moved a second time to dismiss plaintiff Sun's claims to the extent based on foreign DRAM purchases. On October 15, 2007, the court denied defendants' motion without prejudice. The court found that the Foreign Trade Antitrust Improvement Act ("FTAIA"), which precludes application of the Sherman Act to wholly foreign conduct, was applicable to defendants' foreign price-fixing conduct, as alleged. *See* Order Denying Two Motions to Dismiss and Deferring Ruling on One Motion to Dismiss ("Dismissal Order"), 534 F.Supp.2d 1101, 1109–10 (N.D.Cal.2007). Having so found, however, the court noted that the relevant question in this case was not really whether the general rule excluding the Sherman Act's reach over wholly foreign conduct applies, but rather whether the foreign conduct falls within the domestic injury exception to the general rule, such that subject matter jurisdiction may be properly exercised

under the FTAIA. *See id.* This question in turn depended upon whether defendants' foreign conduct (1) had a direct, substantial and reasonably foreseeable effect on domestic commerce; and (2) whether that effect gave rise to a Sherman Act claim. *Id.*

The court found that plaintiff had sufficiently established the first of these two elements, by virtue of the ACC's allegations that defendants' foreign price-fixing activity led to "higher prices for DRAM in the United States, which in turn formed the predicate for plaintiffs' domestic agreements to pay higher prices for DRAM." *See* Dismissal Order, 534 F.Supp.2d at 1113. As to the second and final element, however, the court was unpersuaded. After noting that plaintiff was required to allege proximate causation in order to establish the requisite nexus between domestic effect and foreign injury in order to satisfy the second domestic injury exception prong, the court found plaintiff fell short of the mark by arguing that its global procurement strategy (which set a single global price for DRAM) satisfied the proximate cause test.

Instead of dismissing plaintiff's claims outright for lack of subject matter jurisdiction, however, the court noted that plaintiff had made an alternative argument that warranted further development. Specifically, Sun had argued that, to the extent some of its own foreign facilities, subsidiaries and affiliates had made the foreign DRAM purchases at issue, such purchases were tantamount to Sun's own purchases under a "single enterprise" or agency theory, and Sun stood in those subsidiaries' shoes for purposes of raising their claims. While the court was unable to determine the validity of any such theory on the motion before it, the court stated that "if plaintiffs can articulate and prove a legal theory that would permit the court to find

that they stand in the shoes of or are the alter ego of their foreign affiliates as well as a factual basis for such a claim, the court would be permitted to find that proximate cause under the FTAIA is necessarily satisfied, and that jurisdiction exists." *See id.* at 1116. To that end, the court denied defendants' motion to dismiss without prejudice to defendants' ability to raise the same arguments again "after an appropriate amount of discovery" had been taken to enable both sides to fully develop their arguments. *Id.*

## D. The Instant Motions

Now several months later, discovery has closed and defendants are back before the court having filed seven different motions for resolution, the majority of them dispositive: (1) a motion for partial summary judgment as to Sun's claims based on purchases made by Sun's external manufacturers; (2) a renewed motion to dismiss certain of Sun's claims for lack of subject matter jurisdiction, to the extent based on foreign DRAM purchases; (3) a motion for summary judgment as to Sun's claims based on purchases of DRAM from defendant Mitsubishi entities; (4) an omnibus motion for summary judgment or in the alternative, for summary adjudication; (5) a motion to exclude the expert testimony of plaintiff's expert, Dr. Halbert White; (6) defendant Nanya Technology Corporation's ("NTC") motion for summary judgment on the basis that plaintiff cannot establish a triable issue of fact as to the entities' participation in any overarching price-fixing conspiracy; and (7) defendant Nanya Technology Corporation USA's ("NTC USA") analogous motion on the basis that plaintiff cannot establish a triable issue of fact as to NTC USA's participation in any overarching price-fixing conspiracy.[5] The parties have also filed

numerous evidentiary objections, and requests for judicial notice.

Each of the relevant motions is dealt with in turn below.

## DISCUSSION

### A. Legal Standards

#### 1. Summary Judgment

As a general matter, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court must view the facts in the light most favorable to the non-moving party and give it the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

■ Where, as here, concerted price-fixing is alleged, the plaintiffs bear the ultimate burden of presenting sufficient evidence to prove that an agreement to fix prices existed. *See, e.g., In re Citric Acid Litig.,* 191 F.3d 1090, 1093 (9th Cir.1999) (noting that price-fixing is a per se violation of section 1 of the Sherman Act). In order for them to survive defendants' motion for summary judgment, therefore, plaintiffs must establish that there is a genuine issue of material fact as to whether defendants entered into an illegal conspiracy that caused respondents to suffer a cognizable injury. *See Matsushita,* 475 U.S. at 585–86, 106 S.Ct. 1348. Plaintiffs can establish a genuine issue of material

---

**5.** The first five of these motions are addressed herein, while the latter two motions filed by

NTC and NTC USA are addressed via separate order, to be filed by the court.

fact by producing either direct evidence that defendants participated in an agreement to fix prices, or circumstantial evidence from which a reasonable fact finder could conclude the same. *See, e.g., Movie 1 & 2 v. United Artists Commc'ns,* 909 F.2d 1245, 1251–52 (9th Cir.1990); *United States v. Gen. Motors Corp.,* 384 U.S. 127, 142–43, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966).

With respect to proof by way of circumstantial evidence in section 1 cases, special rules apply. In *Matsushita Elec. Indus. Co.,* the Supreme Court noted that "antitrust law limits the range of permissible inferences from ambiguous evidence in a [section 1] case ...". *See* 475 U.S. at 588, 106 S.Ct. 1348. In addressing plaintiff's burden in proving that an issue of material fact exists on the conspiracy question, the court stated, "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy ...". *See id.* In sum, to survive a motion for summary judgment, "a plaintiff seeking damages for a violation of [section] 1 must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently ...." *Id.*

▇ The Ninth Circuit has embraced *Matsushita* and has outlined a two-part test to be applied whenever a plaintiff rests its case entirely on circumstantial evidence. First, the defendant can rebut an allegation of conspiracy by showing a plausible and justifiable reason for its conduct that is consistent with proper business practice. Second, the burden then "shifts back to the plaintiff to provide specific evidence tending to show that the defendant was not engaging in permissible competitive behavior." *See, e.g., In re Citric Acid Litig.,* 191 F.3d at 1094.

These standards apply here, to the extent that plaintiffs seek to defeat summary judgment as to liability for conspiratorial conduct on the basis of circumstantial evidence, whether in whole or in part.

2. Motion to Dismiss

▇ In evaluating a motion to dismiss, all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. *See, e.g., Burgert v. Lokelani Bernice Pauahi Bishop Trust,* 200 F.3d 661, 663 (9th Cir.2000) (citations omitted). In order to survive a dismissal motion, however, a plaintiff must allege facts that are enough to raise his/her right to relief "above the speculative level." *See Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1964–65, 167 L.Ed.2d 929 (2007). While the complaint "does not need detailed factual allegations," it is nonetheless "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' [which] requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* In short, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face," not just conceivable. *Twombly,* 127 S.Ct. at 1974.

With the above collective standards in mind, the court now turns to the numerous motions before it, and addresses each in turn.

B. Motion for Summary Judgment re External Manufacturer Purchases

Generally, Sun seeks recovery for defendants' alleged Sherman Act violations based not only on the DRAM it purchased and had delivered, but also based on the DRAM delivered to and purchased in the first instance by its foreign subsidiaries and third-party external manufacturers. By way of the instant motion, defendants challenge only those claims based on the external manufacturers' DRAM purchases. Defendants note that the external manu-

facturers initially paid defendant suppliers directly for their DRAM purchases, and argue that this made plaintiff an indirect purchaser of DRAM vis-a-vis those purchases. Thus, plaintiff's claims for recovery, to the extent based on the external manufacturers' DRAM purchases, are barred by the direct purchaser rule of *Illinois Brick v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977).

Sun defends its ability to assert such claims on grounds that it has established an agency relationship with the external manufacturers that gives Sun direct purchaser status in connection with all external manufacturer DRAM purchases, notwithstanding the external manufacturers' actual payment of DRAM prices to the defendants. Even if the court does not deem Sun a direct purchaser by virtue of the agency relationship between Sun and its external manufacturers, plaintiff maintains that it nonetheless satisfies the 'control' exception to the direct purchaser rule recognized in *Illinois Brick*, thus warranting denial of defendants' motion.

The issues for the court to decide are accordingly two-fold: first, whether Sun qualifies as a direct purchaser of the DRAM purchased from defendants by the external manufacturers, such that its claims based on those purchases may go forward under *Illinois Brick*. Second, and in the event Sun does not qualify as a direct purchaser, whether Sun's claims may nonetheless go forward pursuant to the 'control exception' recognized under *Illinois Brick*.

**1. Whether Sun Qualifies as a Direct Purchaser**

■ The direct purchaser rule is well-established. *See, e.g., Illinois Brick*, 431 U.S. 720, 97 S.Ct. 2061. In *Illinois Brick*, plaintiffs were indirect purchasers who sought to convince the court that they had antitrust standing to sue under federal antitrust laws because the illegal overcharge that resulted from defendants' antitrust conspiracy had been passed on to the indirect purchaser plaintiffs by middlemen further upstream. The Supreme Court, however, consistent with its earlier holding in *Hanover Shoe*[6], held that indirect purchasers are too remote to suffer true "antitrust injury," and therefore do not have standing under federal antitrust law to pursue claims. In reaching its conclusion, the court expressed concerns with the complexity of proof involved in any contrary rule, the purpose of the antitrust laws, and risk of multiple liability for defendants if such a rule were not adopted. *See id.* at 731–35, 97 S.Ct. 2061.

Defendants' first and primary argument urges a straightforward application of the direct purchaser rule to the case at bar. They argue that, since the DRAM delivered to the external manufacturers—both domestically and abroad—was paid for in the first instance by the external manufacturers, even if on Sun's ultimate behalf, it is the external manufacturers rather than Sun who qualify as true direct purchasers capable of asserting claims premised on those purchases. For support, they rely on the Ninth Circuit's recent decision in *Delaware Valley Surgical Supply Inc. v.*

---

**6.** In *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, the Supreme Court generally held that a pass-on defense cannot be relied on by defendants who seek to prove that a direct purchaser plaintiff was not actually injured by a violation of the antitrust laws, if the plaintiff has passed on some or all of the illegal overcharge to other subsequent purchasers. *See* 392 U.S. 481, 491–493, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). The court adhered there to the "general principle" that the victim of an overcharge "is damaged within the meaning of [the antitrust standing statute] to the extent of the overcharge" only. *Id.* at 491, 88 S.Ct. 2224.

*Johnson & Johnson,* asserting that it firmly rejects any contrary argument.

Defendants' position on this point is well taken, and their reliance on *Delaware Valley* warranted. In *Delaware Valley,* the Ninth Circuit considered whether a plaintiff hospital had standing to bring a Sherman Act claim against a defendant manufacturer engaged in the provision of sutures and endomechanical products for use in laparoscopic surgery. *See* 523 F.3d 1116, 1118 (9th Cir.2008). The pertinent facts of the case are as follows: plaintiff was a member of a group purchasing organization ("GPO") that negotiated a master agreement with defendant on plaintiff's behalf that set fixed pricing options for all sutures and endomechanical products. *See id.* Plaintiff then executed its own contract with defendant pursuant to the terms of the master agreement, which individual contract allowed plaintiff to purchase products either directly from defendant, or else from an authorized distributor of defendant's products. *Id.* at 1119. Plaintiff chose the latter option, and entered into yet another contract with a distributor, pursuant to which plaintiff procured defendant's products under the specified terms. Plaintiff purchased defendant's products directly from the distributor; it did not pay defendant directly for any products, nor did defendant ship any goods directly to plaintiff. *Id.*

In considering the same direct purchaser rule at issue here, the Ninth Circuit there squarely rejected plaintiff's argument that it could be classified as a direct purchaser of goods from defendant, instead finding plaintiff to be an *in*direct purchaser that lacked standing to sue under the federal antitrust laws. *See Delaware Valley,* 523 F.3d at 1122. The Ninth Circuit reasoned: "It is undisputed that [the distributor] was the immediate purchaser of sutures and endo products from [defendant]. [Distributor] paid [defendant] directly for its inventory and took title in the products before selling them to [plaintiff]. [Plaintiff] directly paid [distributor], not [defendant], for its orders. [Distributor] is not an agent or subsidiary of [defendant], but rather an independently owned and managed company. Following the clear rule set forth in *Illinois Brick,* [plaintiff] lacks standing because the hospital is not a direct purchaser of products from [defendant]." *See id.* Although the Ninth Circuit noted that plaintiff had an independent contractual relationship with the defendant, and that the actual price that plaintiff paid for defendant's products was set by "an agreement negotiated [with defendant] by a GPO on behalf of plaintiff," it also noted that plaintiff additionally "had a contract with [the distributor], and it was that contract that ultimately effectuated the transfer of these goods." *See id.*

Notably, the Ninth Circuit observed that its conclusion was dictated in part by the Supreme Court's post *Illinois Brick* precedent, which clarified the Court's intention to establish a "bright line rule" by means of the direct purchaser rule, and had already "closed the door on the theory that an end user who buys from an independent distributor, rather than the manufacturer, should have standing because it may be the most efficient enforcer of antitrust laws." *Id.* at 1122–1123 ("*Illinois Brick* is not a policy holding, but rather a case of statutory construction").

*Delaware Valley* is controlling. Plaintiff does not dispute that its external manufacturers initially paid for the DRAM that was delivered to them for incorporation into Sun products, which products would in turn be delivered and sold to Sun at cost, plus an agreed upon mark-up. Nor does plaintiff dispute that the external manufacturers took title to the DRAM initially purchased from the suppliers, or that the external manufacturers were independent-

ly owned and managed corporate entities. Thus, this case is directly in line with *Delaware Valley*, and compels the conclusion that it is the external manufacturers, and not plaintiff, who must be deemed the "immediate purchasers" of DRAM. This is so, despite the existence of an overarching independent pricing strategy maintained and operated by Sun in connection with purchases of DRAM from defendants. After all, and notwithstanding plaintiff's protestations to the contrary, the same reasons articulated by the *Delaware Valley* court in rejecting the plaintiff hospital's direct purchaser claim on the basis of its independent contractual relationship with the defendant, apply here, too.

Plaintiff's agency argument that the external manufacturers acted as mere "purchasing agents" for Sun, does not change this analysis. As articulated by plaintiff's counsel at the hearing on the instant motion, a finding that the external manufacturers acted as Sun's purchasing agents would allow the external manufacturers' direct payments to defendant DRAM suppliers to be legally attributed to Sun, thereby cloaking Sun with the necessary authority to assert claims based on external manufacturer DRAM purchases. Application of this purchasing agency theory would also allow plaintiff to proceed "outside the scope of *Illinois Brick*," in counsel's words, thereby obviating any objections based on *Delaware Valley*. For support for the purchasing agency theory, plaintiff relies on *In re Coupon Clearing Service, Inc.*, 113 F.3d 1091 (9th Cir.1997), and *E. & J. Gallo Winery v. EnCana Energy Servs., Inc.*, 2008 WL 2220396 (E.D.Cal. May 27, 2008). *See* Pl. Opp. Re EM Purch. at 9:11–12:19.

These cases, however, are neither persuasive nor controlling. *In re Coupon Clearing Serv.* is a bankruptcy decision and did not address federal antitrust law at all, let alone did it consider the availability of an agency theory as an alternative theory available in the direct/indirect purchaser context. As for *E. & J. Gallo Winery*, it does address the availability of a general agency theory in the federal antitrust context. However—and putting aside the decision's non-binding status upon this court—*E. & J. Gallo Winery* only considered the availability of a general agency theory to a plaintiff seeking to impose antitrust *liability* on parent-subsidiary corporations. This is, in the court's view, a distinct question from the issue urged by plaintiff upon the court here— i.e., whether a plaintiff can invoke a purchasing agency theory as an alternative means of establishing direct purchaser standing for purposes of asserting federal antitrust claims. In contrast to the agency theory discussed by the district court in *E. & J. Gallo Winery*, the present inquiry precedes the question of antitrust liability entirely, and instead deals with a plaintiff's legal ability to assert antitrust claims in the first instance.

Aside from the lack of convincing legal support for plaintiff's purchasing agency theory, moreover, the real problem with plaintiff's argument is that it requires the court to turn its back on what it views as the clear governing framework of *Illinois Brick*. As the Ninth Circuit has made clear, that framework set forth a "bright line rule" that prohibits all but direct purchasers from bringing suit under the federal antitrust laws—adherence to which is required under the undisputed factual scenario advanced here. *See Delaware Valley*, 523 F.3d at 1122–23. Thus, and without clear legal authority to the contrary, no justification for departing from this well-recognized framework exists. And while plaintiff correctly notes that *Delaware Valley* did not have occasion to examine the precise purchasing agency argument advanced here, the factual similarities in the case at bar to *Delaware Valley* persuade this court that any such

argument would have been discredited by the Ninth Circuit as yet another misguided attempt to fashion a "new formulation of the Illinois Brick rule." *See id.* at 1123, 1124 (the Supreme Court's "firm [direct purchaser] rule does not provide us the leeway to make a policy determination on a case-by-case basis as to whether standing should be recognized when there are special business arrangements").

In sum, therefore, fidelity to controlling precedent requires the conclusion that for all claims based on DRAM purchases made by external manufacturers, it is those external manufacturers and not Sun who qualify as direct purchasers capable of bringing suit, pursuant to the direct purchaser rule of *Illinois Brick.*

### 2. Control Exception to Illinois Brick Direct Purchaser Rule

■ Sun asserts, however, that even if the court concludes that Sun does not qualify as a direct purchaser under *Illinois Brick,* it is nonetheless qualified to assert claims based on external manufacturer DRAM purchases, by virtue of the 'control' exception recognized in *Illinois Brick.*

The 'ownership' or 'control' exception permits offensive use of the pass-on theory in situations where "market forces have been superseded." One example of such a situation occurs when the direct purchaser is owned or controlled by a member of an alleged conspiracy. *See, e.g., Illinois Brick,* 431 U.S. at 736 n. 16, 97 S.Ct. 2061 ("Another situation in which market forces have been superseded and the pass-on defense might be permitted is where the direct purchaser is owned or controlled by its customer"); *cf. Perkins v. Standard Oil Co.,* 395 U.S. 642, 648, 89 S.Ct. 1871, 23 L.Ed.2d 599 (1969); *In re Western Liquid Asphalt Cases,* 487 F.2d 191, 199 (9th Cir. 1973). While long-recognized, however, there are few authoritative cases that clearly define the legal showing required to justify application of the control exception, and no Ninth Circuit authority that provides affirmative guidance on the issue. As a general matter, the ownership and control exception has been construed to encompass relationships involving such functional economic or other unity between the direct purchaser and either the defendant or the indirect purchaser, that there effectively has been only one sale. *See, e.g., Jewish Hosp. Ass'n v. Stewart Mech. Enters.,* 628 F.2d 971, 975 (6th Cir.1980); *Royal Printing Co. v. Kimberly–Clark Corp.,* 621 F.2d 323, 326–27 (9th Cir.1980); *see also, e.g., In re Mercedes–Benz Anti–Trust Litig.,* 157 F.Supp.2d 355, 355 (D.N.J.2001) ("[T]he rationale of Illinois Brick's bar to indirect purchaser suits does not apply where the supposed intermediary is controlled by one or the other of the parties"). Some examples of the types of facts that would satisfy the control exception have furthermore been defined as: "interlocking directorates, minority stock ownership, loan agreements that subject the wholesalers to the manufacturers' operating control, trust agreements, or other modes of control separate from ownership of a majority of the wholesalers' common stock." *In re Brand Name Prescription Drugs Antitrust Litig.,* 123 F.3d 599, 606 (7th Cir.1997).

Here, plaintiff concedes that it and the external manufacturers were separate legal entities, lacked interlocking directorates and officers, did not own each other's stock, and did not enter into loan agreements, trust agreements, or extensions of credit on behalf of one another. *See, e.g.,* Pl. Opp. Br. at 15:20–26; *see also, e.g.,* Moore Decl., Ex. 5, Responses 48, 58; Ex. 8 at 68–76; Ex. 15 at ¶ 18; Ex. 13 at 50–52, 118. Plaintiff contends, however, that these facts are not determinative of the control question, since application of the exception depends upon the narrower issue whether sufficient control is exercised in connection with the actual procurement

of DRAM for incorporation into Sun products *only*—not whether it is exercised in connection with structural day to day control of an entity. And this, says plaintiff, it has indisputably demonstrated based on the uncontested evidence showing that Sun determined from whom, at what price, and at which percentage of business the external manufacturers would order DRAM; that Sun provided forecasts to determine the quantities of DRAM ordered by the external manufacturers; and that Sun bore the cost of the DRAM that was ordered by the external manufacturers on its behalf (by paying for the DRAM at cost plus a percentage mark-up). *See, e.g.,* Moore Decl. Re EMs, Ex. 7 at 76; *see also, e.g.,* Cross EM Opp. Decl., Ex. 22 at 82–83, 613; Ex. 26 at 160; Ex. 27 at 128–29; Ex. 28 at 62–64; Ex. 29 at 28–29, 119–122, 124, 134–45; Ex. 30 at 125–26; Ex. 32 at 45–50.

For support of its argument that it is only control over the external manufacturers' DRAM procurement activities that counts for purposes of the control exception (rather than the presence of structural control), plaintiff relies primarily on *In re Toilet Seat Antitrust Litig.,* 1977 WL 1453 (E.D.Mich. Aug. 24, 1977). As plaintiff notes, *In re Toilet Seat* found that a plaintiff lumber company could allege class action antitrust claims against defendant manufacturers of toilet seats, notwithstanding that plaintiff did not "purchase directly from" the manufacturers but rather relied on a midstream purchasing agent to make purchases on plaintiff's behalf. *See id.* at *2. The court found that plaintiff's relationship with the purchasing agent was one of "principal and agent" rather than buyer and seller, and that the relationship fell within the control exception of *Illinois Brick. Id.* The evidence that the court relied on in coming to this conclusion demonstrated: that the middle agent with whom plaintiff dealt was a "purchasing concern;" that plaintiff engaged the agent for "a flat monthly fee;" that the fee paid to the agent "bore no relation to the quantity of goods obtained;" and that billing arrangements varied with different transactions, although in some circumstances, the agent would be billed first and in turn would bill plaintiff. *Id.*

Putting aside for the moment the fact that *In re Toilet Seat* constitutes (as so many of the cases cited herein by the parties do) non-binding authority, it is not altogether persuasive. *In re Toilet Seat* teaches that the control exception may be satisfied when the plaintiff employs an independent broker or purchasing agent as middle man whose sole function is to act as a mere conduit for the procurement of goods. This, however, is different from the case at bar. Here, plaintiff does not dispute that it employed external manufacturers for assistance in the actual manufacture of Sun products—*not* simply as brokers to act as conduits for the procurement of DRAM. This broader relationship triggers additional complexities that are highlighted by the different billing arrangements evidenced in both cases. *In re Toilet Seat* notes, for example, that plaintiff's purchasing agent was paid a flat monthly fee for its services that bore no relationship to the quantity of goods obtained. Here, by contrast, Sun's payments to external manufacturers are directly proportional to the amount of Sun-finished products that Sun purchases, since all products are paid for on a cost basis, plus an additional percentage mark-up. These differences serve to highlight a larger disparity: whereas *In re Toilet Seat* is characterized by facts indicating that market forces have been suspended (e.g., flat fee payment that is resistant to supply and demand forces), the present case is characterized by a relationship in which traditional market forces remain in play. As such, the fundamental premise upon which the control exception is to be applied—i.e., in situations in which market forces are

suspended—is not evident here, even if evident under the facts of *In re Toilet Seat.*

This conclusion is consistent with *Jewish Hosp. Ass'n,* a Sixth Circuit case that both sides agree is instructive. *See* 628 F.2d at 975. In listing there the "examples of situations where an ownership or control relationship between an indirect purchaser and a direct purchaser might make the passing-on bar inapplicable," the Sixth Circuit noted situations involving parent-subsidiary relationships, or one company's stock ownership of another, as the paradigmatic examples. *Id.* Significantly, however, the court also noted that, while a relationship with an independent broker or purchasing agent such as that described in *In re Toilet Seat* could also satisfy the exception, this rule only applies where market forces are truly superseded. *Id.*; *see also Howard Hess Dental Lab. v. Dentsply Intern.,* 424 F.3d 363, 372 (3d Cir.2005) ("modes of control that might qualify for the control exception include 'interlocking directorates, minority stock ownership, loan agreements that subject the wholesalers to the manufacturers' operating control, [or] trust agreements'").

Since there is no evidence that plaintiff's external manufacturers were independent purchasing agents of the type contemplated by *In re Toilet Seat* and *Jewish Hosp. Ass'n,* application of the control exception is therefore inappropriate here, unless plaintiff can demonstrate other recognized modes of control that might suggest that market forces have been superseded—e.g., interlocking directorates, minority stock ownership, loan agreements that subject the wholesalers to the manufacturers' operating control, etc. As noted, however, it is undisputed that this is not the case.

It is worth noting, furthermore, that to the extent that the external manufacturers retain, and have exercised, their right to sue defendants, this further confirms that market forces have not been superseded in the traditional sense contemplated by the control exception, and that the policy reasons behind the *Illinois Brick* decision remain intact. Indeed, as defendants point out, at least two external manufacturers—Celestica and Solectron—have submitted direct purchaser claim forms as part of the direct purchaser MDL proceedings in the *In re DRAM* litigation before the court. *See* Moore Decl. Re EMs, Ex. 13 at 41–43; Exs. 17–19.

In sum, therefore, the court concludes that plaintiff has failed to introduce a material dispute of fact as to whether market forces here have been superseded in the manner contemplated for the control exception to apply.

\* \* \*

Based on all the foregoing, the court agrees with defendants that Sun does not qualify as a true direct purchaser for those claims based on DRAM purchases made by external manufacturers, and has furthermore failed to established a material dispute of fact as to application of the control exception to *Illinois Brick.* Defendants' motion for summary judgment is accordingly GRANTED.

### C. Motion to Dismiss Claims Based on Foreign DRAM Purchases

■ Defendants' motion to dismiss seeks a ruling that the court lacks subject matter jurisdiction over plaintiff's claims, to the extent based on purchases made by Sun's foreign subsidiaries.[7] As noted, the

---

7. Defendants' motion also targets all claims based on purchases made by Sun's foreign external manufacturers. Thus, defendants seek dismissal of claims based on an aggre-

gate total purchase amount of "more than $762 million between August 1998 and June 2002 and more than $732 million between April 1999 and June 2002." *See* Cross FTAIA

motion is defendants' third attempt to persuade the court to dismiss plaintiff's claims based on foreign DRAM purchases, and "addresses the narrow jurisdictional question remaining after the court's October 2007 ruling on defendants' motion to dismiss"—i.e., whether plaintiff can articulate and prove a legal theory that would satisfy proximate causation under the FTAIA. According to defendants, the completion of discovery has now sufficiently developed the factual record to make clear "that Sun cannot carry its jurisdictional burden" under the statute.

As discussed ad nauseam in the court's prior dismissal orders, the court's assertion of subject matter jurisdiction over plaintiff's claims based on foreign subsidiaries' DRAM purchases—notwithstanding the general proscriptions of the FTAIA—generally requires a showing that defendants' foreign conduct (1) had a direct, substantial and reasonably foreseeable effect on domestic commerce; which (2) gave rise to a Sherman Act claim. *See* 15 U.S.C. § 6a.; *see also F. Hoffmann–La Roche Ltd. v. Empagran S.A.,* 542 U.S. 155, 158, 124 S.Ct. 2359, 159 L.Ed.2d 226 (2004); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.,* 546 F.3d 981, 987–88 (9th Cir.2008). Having already found that plaintiff has shown the former, the court now limits its inquiry to the latter, and examines whether plaintiff can demonstrate proximate causation between the recognized domestic effect of defendants' conduct (i.e., the setting of higher prices for DRAM in the United States) and plaintiff's foreign injury (i.e., the payment of higher DRAM prices abroad). *See* discussion, *supra* at 1173–75; Dismissal Order, 534 F.Supp.2d at 1115–16; *see also In re Dynamic Random Access Memory (DRAM) Antitrust Litig.,* 546 F.3d at 987–88. Resolution of this inquiry depends upon resolution of plaintiff's two alternative theories: (1) the single enterprise theory; and (2) the agency theory.[8]

Before getting to the merits of these theories, however, there are two preliminary issues raised by the parties that require resolution.[9] First, plaintiff contends, as it has previously, that it is legally improper in the first instance to sever for the court's consideration any portion of claims based on foreign DRAM purchases, since those claims are also based on domestic DRAM purchases—the court's jurisdiction over which no one disputes. Second, and assuming severance of the foregoing claims for the court's consideration is permissible, the parties dispute whether the proper legal standard to be applied in evaluating the instant motion is that provided

---

Opp. Decl., Ex. 1 at ¶ 4. However, in view of the court's grant of summary judgment with respect to all claims based on DRAM purchases made by external manufacturers—both domestic *and* foreign—this additional ground is now moot for purposes of the instant motion to dismiss.

8. It should be noted that defendants' moving papers also seek dismissal based on Sun's inability to demonstrate subject matter jurisdiction over the claims at issue pursuant to an alter ego theory. However, as Sun states in its opposition brief and conceded at the hearing, it is not pursuing an alter ego theory in arguing for subject matter jurisdiction. *See* MTD Opp. Br. at 10:15–11:3 (the "alter ego

and veil piercing analyses addressed by defendants are materially different" from the single enterprise theory being argued by Sun).

9. Plaintiff also initially contends "[a]s a threshold matter," that defendants have stipulated that the only transactions at issue in this motion are deliveries of DRAM to Sun's foreign facilities, and not deliveries of DRAM to Sun's external manufacturers. The court has already decided that the latter issue is moot for purposes of this motion. Even if it had not so decided, however, the court would nonetheless find that the stipulation at issue lends no support for plaintiff's argument. *See* Cross FTAIA Opp. Decl., Ex. 1.

by Federal Rule of Civil Procedure 12(b)(1), or alternatively, Federal Rule of Civil Procedure 56.

As to the first preliminary issue, plaintiff contends that since it is undisputed that the court has jurisdiction over Sun's claims premised on *domestic* deliveries of DRAM, the court cannot arbitrarily carve out from these claims the portion that are based on foreign deliveries, and dismiss them. This argument is unpersuasive, however, for as defendants point out, the court already considered and ruled upon the issue in its October 2007 order. Specifically, the court there said: "as to whether plaintiffs' claims based on foreign injury are severable from their claims based on domestic injury (which defendants have not moved to dismiss), the court agrees with a number of courts who have employed sound analysis in determining that such claims are severable." Dismissal Order, 534 F.Supp.2d at 1116 (*citing In re Rubber Chemicals Antitrust Litig.*, 504 F.Supp.2d 777, 781–83 (N.D.Cal.2007)). Plaintiff presents no compelling reason for departure from this earlier holding. To the extent, moreover, that plaintiff rests its renewed argument against severance on the court's corollary statement that it "need not decide the issue definitively" on the prior dismissal motion, the court takes the opportunity now to definitively decide the issue in favor of severance.

As to the parties' second preliminary dispute over the proper legal standard applicable to the present motion, the court concludes that defendants have correctly argued in favor of application of a 12(b)(1) standard, rather than a Rule 56 standard.

Both parties rely on *Thornhill Publ'g Co. v. Gen. Tel. & Elec.*, 594 F.2d 730 (9th Cir.1979) in their competing approaches to this issue. In *Thornhill*, the Ninth Circuit affirmed the lower court's grant of defendant's summary judgment motion seeking dismissal of plaintiff's complaint on grounds that the complaint's alleged conduct was outside the jurisdictional reach of the Sherman Act. The trial court had applied the Rule 56 summary judgment standards in deciding the motion, rather than the 12(b)(1) standard usually applied to motions to dismiss for lack of subject matter jurisdiction. While noting that it need not definitively resolve the question whether the Rule 56 standard or a 12(b)(1) standard should have been applied by the district court, the *Thornhill* court made several observations about the use of these standards in the antitrust context.

The Ninth Circuit noted that where, as here, a motion attacking jurisdiction is made on the basis of facts in the record, such a motion is commonly labeled a "speaking motion," which is subject to analysis pursuant to 12(b)(1) standards, and which allows the court to resolve disputed facts in evaluating the jurisdictional claims. *See* 594 F.2d at 733. However, the court went on to note that, where the jurisdictional issues in an antitrust case are not separable from the merits of a case (e.g., where an element required to state a Sherman Act claim "is an element of the substantive offense as well as a jurisdictional requirement"), then a motion going to the jurisdictional issue should be accorded Rule 56 treatment. *See id.*

The *Thornhill* court also took specific note of a prior recent case in which the Ninth Circuit considered the jurisdictional and substantive issues presented in a Sherman Act case specifically, found them to be legally distinct, and applied a 12(b)(1) legal standard. The *Thornhill* court quoted language from that prior case as follows: "[t]he jurisdictional issue under the Sherman Act is distinct from the substantive issue of whether a given defendant's conduct was of the kind prohibited by the Act'... Specifically, 'the jurisdictional question ... is whether defendants' con-

duct had a sufficient relationship to interstate commerce to be subject to regulation by Congress ... (while) the substantive issue ... is whether defendants participated in anti-competitive conduct." *Id.* at 735. The *Thornhill* court cautioned, however, that this earlier observation had been reached in a case where the opposing party had conceded that the jurisdictional and substantive issues were separable. To that end, and notwithstanding the reasoning of this earlier case, the *Thornhill* court concluded that in a case "where the jurisdictional issue and the substantive issues are so intermeshed that the question of jurisdiction is dependent on decision of the merits," the Rule 56 standard still applies. *See id.*

*Thornhill*'s discussion is complicated and not altogether clear. Nonetheless, as applied here, *Thornhill* is best read as suggesting that the 12(b)(1) standard, rather than a Rule 56 standard, is appropriate. The jurisdictional issues in the case—while factual in nature—do not appear to be so "enmeshed" with the substantive issues of plaintiff's Sherman Act claim such as to require Rule 56 treatment. As the *Thornhill* court contemplated, the jurisdictional issue in Sun's Sherman Act and Cartwright Act claims (insofar as the foreign purchase based claims are concerned) is whether defendants' conduct had a sufficient relationship with the domestic effects of that conduct and plaintiff's injury, so as to be subject to regulation under the FTAIA. The substantive issues of plaintiff's claims, however, are whether defendants participated in anti-competitive conduct by conspiring to fix prices. Since the two issues are distinct, analysis pursuant to 12(b)(1) standards is appropriate. Accordingly, the court shall consider the factual evidence presented and resolve factual disputes as necessary to determine the existence of jurisdiction as a matter of law.

Having disposed of the preliminary issues, the court now turns to the two theories advanced by plaintiff.

### 1. *Single Enterprise Theory*

Plaintiff asserts that it stands in the shoes of its wholly owned foreign subsidiaries—and thus that those subsidiaries' DRAM purchases at artificially high levels were proximately caused by the setting of a single inflated DRAM price in the U.S.— because it, Sun Scotland and Sun Netherlands collectively "operated as a single enterprise with a unified purpose in the production and sale of Sun products and the procurement of components, such as DRAM, needed to assemble those products." *See* Pl. Opp. Br. at 10:2–4. As evidence of this single enterprise theory, Sun points to the global DRAM procurement strategy instituted and managed by Sun's global memory procurement team headquartered in California. Plaintiff also relies on several district court cases, including, primarily, *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), and *Aventis Envtl. Sci. USA LP v. Scotts Co.*, 383 F.Supp.2d 488, 499–500 (S.D.N.Y. 2005). Ultimately, however, neither plaintiff's reliance on the evidence nor its reliance on the case law withstands scrutiny.

To begin with, plaintiff's legal authority is less than compelling. While true that a single entity doctrine was announced in *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), that case held that parent and subsidiary corporations are to be considered a single collective entity for purposes of conspiracy liability under section 1 of the Sherman Act, and cannot be found liable for conspiracy with each other under the Act. The doctrine therefore expressly deals with the question whether a parent and subsidiary corporation may be charged with conspiring with each other,

and not, as is the case here, with the question whether those two entities may collectively be treated as a single entity for purposes of jurisdictional antitrust standing. Nor has any other case relied on by plaintiff so extended the single entity doctrine announced in *Copperweld*.

Plaintiff is closer to the mark in citing *Aventis*, an antitrust case allowing a U.S. affiliate plaintiff to assert antitrust claims based on the harm done to its foreign affiliate. *See Aventis*, 383 F.Supp.2d at 499–500. *Aventis* noted that plaintiffs had "proffered evidence which, if believed, would demonstrate that all three [affiliate plaintiff] entities were acting as a single enterprise and shared a complete unity of interests." *Id.* Nonetheless, *Aventis* is distinguishable. First, and as defendants point out, it did not deal with the FTAIA specifically. Putting this concern aside, however, the court finds it significant that the foreign affiliates in *Aventis* had assigned their antitrust claims to the plaintiff affiliate corporation. *Id.* This fact alone strongly suggests a plaintiff's entitlement to assert claims on behalf of its foreign affiliates. Here, however, this critical fact is lacking. Furthermore, the *Aventis* court provided no analysis supporting its conclusion; thus, it is impossible for this court to meaningfully evaluate the contours of any single entity doctrine applied by that court. And while *Aventis* did note that two other district court cases had affirmed the existence of the single entity doctrine, neither of those cases dealt with a similar FTAIA context. *See, e.g., In re Vitamins Antitrust Litig.*, 2001 WL 755852, at *3 (D.D.C. June 7, 2001) and *Farmland Dairies, Inc. v. New York Farm Bureau, Inc.*, 1996 WL 191971, at *4 (N.D.N.Y. Apr. 15, 1996) (holding without meaningful discussion that a parent could bring antitrust claims on behalf of its subsidiary when their interests were the same and they were treated as the same entity). In sum, therefore, plaintiff's legal authorities—the majority of which are non-binding—have not convinced the court that the single entity doctrine should be applied in the manner advanced by plaintiff here.

Second, defendants correctly point out that plaintiff rests its evidence in support of its single enterprise theory in part on a global procurement strategy that has already been discredited. *See* Opp. Br. at 10:2–5 (Sun and its subsidiaries "operated as a single enterprise with a unified purpose in the production and sale of Sun products and the procurement of components, such as DRAM, needed to assemble those products"); *see also* Cross FTAIA Opp. Decl., Ex. 3 at ¶ 4. Both this court and the Ninth Circuit have held that, to the extent plaintiff's proximate causation theory rests on proof of a global procurement strategy, this is not a viable legal theory. *See, e.g., In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d at 989–90 (rejecting plaintiff's attempt to argue "a direct correlation between the U.S. price and the prices abroad" and fact "that the [d]efendants' activities resulted in the U.S. prices directly setting the worldwide price," and noting prior rejections of "single global price" theories of proximate causation). Thus, plaintiff's reliance on its global procurement strategy as evidence in support of its proximate causation argument—if made via a single enterprise theory—must be rejected.

In sum, the court finds that plaintiff has failed to sufficiently demonstrate that application of a single entity doctrine is appropriate in the manner urged by plaintiff here as to the foreign subsidiaries.

### 2. *Agency Theory*

This leaves plaintiff with its second, and alternative, theory—that of agency. Plaintiff argues that agency principles are satisfied under one of two different, but equally applicable, agency doctrines: the repre-

sentative services doctrine, and the traditional common law doctrine of agency. Defendants, for their part, assert that Sun cannot satisfy either.

Preliminarily, an overview of the relevant agency doctrines is appropriate. The representative services doctrine, which the Ninth Circuit has acknowledged in the personal jurisdiction context, asks whether the subsidiary functions as the parent corporation's representative in performing services that are sufficiently important that if it did not have a representative to perform them, the parent would undertake to perform similar services on its own. *See Harris Rutsky & Co. Ins. Services, Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1134–35 (9th Cir.2003) (representative agency test permits the imputation of contacts where the subsidiary was "either established for, or is engaged in, activities that, but for the existence of the subsidiary, the parent would have to undertake itself"); *Doe v. Unocal*, 248 F.3d 915, 925, 928 (9th Cir.2001) ("the question to ask is ... whether, in the truest sense, the subsidiaries' presence substitutes for the presence of the parent").

■ The traditional common law agency doctrine—for which both parties cite federal district court authorities—is based on analysis of three factors: (1) manifestation by a principal that the agent would act on its behalf; (2) the agent's acceptance or consent to act on the principal's behalf; and (3) the understanding that the principal would be in control of the agent's undertaking on its behalf. *See Bowoto v. Chevron Texaco Corp.*, 312 F.Supp.2d 1229, 1241–42 (N.D.Cal.2004); *E & J Gallo Winery v. EnCana Energy Servs., Inc.*, 2008 WL 2220396, *11 (E.D.Cal.2008). Whereas the representative services doctrine acknowledged in *Doe* considers the agency question in light of the parent-

subsidiary relationship in the jurisdiction context, both *Bowoto* and *E & J Gallo* consider the agency question in light of the parent-subsidiary relationship in the liability context.

In determining which legal standard to apply in order to determine the existence of an agency relationship for FTAIA jurisdiction purposes, the court notes that neither of the alternatives presented by the parties is, strictly speaking, persuasive. Neither the personal jurisdiction context nor the liability context discussed in the cited cases, for example, is directly on point with the FTAIA scenario. Moreover, after review of the cited case law, the court finds that the scope of the agency test laid out therein is less than clear. Thus, it is not immediately apparent to the court that either of the two formulations discussed by the parties should be given immediate effect, their contrary arguments notwithstanding.

This is not to say that the cases are not helpful, however. *Bowoto* and *E & J Gallo*, for example, both correctly note that the traditional common law of agency provides the basis for the guiding principles that should be given effect in this case. And as both district courts acknowledge, in the area of agency, it is federal common law that controls with respect to federal claims like the Sherman Act. *See Bowoto*, 312 F.Supp.2d 1229; *E & J Gallo*, 2008 WL 2220396 at *5. In turn, federal common law is guided by those principles set forth in the Restatement of Agency. Turning, then, to the operative Restatement Third, it lays the foundation for a traditional agency test that requires a plaintiff to demonstrate: (1) a manifestation by the principal that the agent shall act for him; (2) that the agent has accepted the undertaking; and (3) that there is an understanding between the parties that the principal is to be in control [10] of the

---

**10.** The court observes that the concept of 'control,' as employed for purposes of the

undertaking. *See* Restatement (Third) of Agency, § 1.01; *see also Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 849 (D.C.Cir.2000). This, therefore, is the test that the court employs here.

Applying this test here, the ultimate question is therefore whether plaintiff can point to facts that establish (1) Sun's intent to have its foreign subsidiaries act on Sun's behalf in purchasing DRAM; (2) that the foreign subsidiaries accepted and/or understood their role in purchasing DRAM on Sun's behalf; and (3) that there is an understanding between Sun and its foreign subsidiaries that Sun is to be in control of the subsidiaries' procurement of DRAM. To that end, plaintiff submits the following facts: Sun's foreign facilities purchased DRAM at prices set, from vendors chosen, and amounts determined by a global memory procurement team based as Sun headquarters in California; and the DRAM suppliers' own records demonstrate that Sun was a single customer, without distinction between Sun and its foreign subsidiaries. *See* Cross FTAIA Opp. Decl., Ex. 3 at ¶¶ 4–8;[11] *id.* at Exs. 12–16.

While defendants do not dispute these facts, they point out that Sun's subsidiaries—specifically, Sun Scotland and Sun Netherlands—issued their own purchase orders to primarily European entities of defendant DRAM manufacturers; had their own equitable ownership different than Sun's; were sufficiently capitalized to satisfy their own debts and liabilities; did not maintain common funds or commingle assets with Sun; used their own accounts to settle the invoices issued to them by their European DRAM suppliers; took delivery of the DRAM they purchased and used that DRAM to manufacture finished products; and sold those products through their own European sales offices. *See* Declaration of Steven Bergman ISO FTAIA Dismissal ("Bergman FTAIA Decl."), Ex. 4 at Responses 2, 6–8, 10, 12, 20, 25–27, 29, 31; *id.*, Ex. 11 at 63:16–64:17; *see also* Cross FTAIA Opp. Decl., Ex. 1 at ¶¶ 4,6. Based on these facts, defendants contend that the subsidiaries themselves controlled their purchases of DRAM, and there is no basis for concluding that they acted as Sun's agent with respect to the procurement of DRAM overseas.

Ultimately, the court agrees with defendants. As an initial matter, the undisputed facts fairly demonstrate, as plaintiff submits, that plaintiff intended to have its foreign subsidiaries purchase DRAM under terms and conditions, and from DRAM suppliers, established by Sun's global procurement team in California; that the foreign subsidiaries did, in fact, purchase their DRAM from DRAM suppliers pursuant to Sun's global procurement strategy; and that, to the extent Sun's global procurement team established and enforced its DRAM procurement strategy—via its communications with DRAM suppliers and the foreign subsidiaries—Sun was in con-

---

traditional agency test, is distinct from the legal test for 'control' that applies in connection with the well-recognized control exception to *Illinois Brick* (discussed *supra* in connection with defendants' motion challenging external manufacturer purposes). This is so even if, as defendants pointed out at the hearing, the underlying arguments going to both are similar.

11. Defendants have objected to the Declaration of Peter Wilson, on grounds that the information contained therein constitutes "new" evidence not previously disclosed, and that its disclosure now violates Sun's earlier obligation to supplement all discovery responses by June 30, 2008. The court overrules this objection, however, in light of defendants' failure to set forth an adequate showing as to what evidence contained in the declaration is actually "new."

trol of its procurement strategy. Critically, however, and notwithstanding this showing, the undisputed facts do *not* demonstrate that Sun intended, or that the foreign subsidiaries understood, that any DRAM purchases were being made on *Sun's* behalf, as opposed to on behalf of the foreign subsidiaries. In fact, and as defendants note, the facts demonstrate that the subsidiaries purchased DRAM from primarily European entities of defendant DRAM manufacturers, took delivery of the DRAM they purchased, and used that DRAM to manufacture finished Sun products that were sold through the subsidiaries' own European sales offices. All of which suggests that, although Sun may have established and controlled the applicable DRAM pricing strategy pursuant to which the subsidiaries purchased DRAM, it is the subsidiaries who then took charge of their own DRAM purchases, for their own eventual use. Significantly, plaintiff has submitted no evidence disputing these facts.

Moreover, to the extent that plaintiff seeks to transform Sun's undisputed control over its global procurement strategy into a finding that Sun's subsidiaries are but agent actors whose every move in furtherance of Sun's global strategy should be imputed to Sun, the court is mindful that some degree of control is usually, even if not necessarily, implicit in the parent subsidiary relationship. Thus, the degree of control exercised by the parent in order for the subsidiary to qualify as an agent must therefore exceed that which is to be expected in the normal scope of any such relationship. Furthermore, defendants' point that, having availed itself of the advantages of the parent subsidiary relationship under corporate law, Sun cannot now easily disavow itself of such to suit its purposes, is well taken. *See, e.g., Disenos Artisticos, E Industriales, S.A. v. Costco Wholesale Corp.,* 97 F.3d 377, 380 (9th Cir.1996) (noting that a corporation is not entitled to establish and use its affiliates' separate legal existence for some purposes, yet have their separate corporate existence disregarded for its own benefit against third parties) ("[g]enerally, the corporate veil can be pierced only by an adversary of the corporation, not by the corporation itself for its own benefit").

In sum, the court finds that, notwithstanding Sun's acknowledged control with respect to its global procurement *strategy,* the undisputed evidence demonstrates that Sun Scotland and Sun Netherlands controlled, in large part, their own purchases of DRAM for their own use and sale. As such, plaintiff's effort to demonstrate that the subsidiaries were acting on Sun's behalf, or that Sun maintained the requisite level of control over the subsidiaries' actual purchases, fails. The foreign subsidiaries cannot therefore be deemed Sun's agents for purposes of the foreign DRAM purchases made by them.

Having failed to persuade the court that application of either a single enterprise or agency theory is appropriate, plaintiff has exhausted the avenues available to it to show that the foreign DRAM purchases made by its foreign subsidiaries should in effect be considered purchases made by Sun itself. Without a valid theory to show that it stands in the shoes of its subsidiaries for purposes of those DRAM purchases, the purchases themselves must be viewed as foreign transactions made by independent subsidiary entities, albeit pursuant to a global pricing strategy instituted by its parent corporation, Sun.

Under these facts, the court cannot find jurisdiction under the FTAIA for any claims premised on such purchases. As noted time and again by this court, the FTAIA requires that plaintiff demonstrate that the higher U.S. DRAM prices caused by defendants' conduct proximately caused *plaintiff* to pay higher DRAM prices

abroad. However, as has just been determined, it is plaintiff's subsidiaries, rather than plaintiff itself, who actually paid any higher DRAM prices abroad. To the extent Sun suffered any injury as a result of its subsidiaries' higher DRAM payments, those injuries are derivative of those suffered by the foreign subsidiaries. Thus, no proximate cause link has been established. *See, e.g., In re Dynamic Random Access Memory Antitrust Litig.*, 546 F.3d at 988 ("The defendants' conspiracy may have fixed prices in the United States and abroad, and maintaining higher U.S. prices might have been necessary to sustain the higher prices globally, but [plaintiff] has not shown that the higher U.S. prices proximately caused *its* foreign injury of having to pay higher prices abroad. Other actors or forces may have affected the foreign prices.") (emphasis added).

In so ruling, the court declines plaintiff's invitation to re-examine the boundaries of its earlier proximate cause holding. As the court stated in its most recent dismissal order, the only question for resolution at this stage is the existence of proximate cause vis-a-vis the two theories highlighted and discussed herein. Moreover, while plaintiff's counsel's desire to revisit the issue is understandable, the court disagrees at the outset with counsel's characterization of the court's earlier proximate cause inquiry. Contrary to counsel's statement at the hearing that the court's earlier discussion of the issue focused on whether a higher negotiated U.S. DRAM price "cause[d] Sun to go out and purchase a lot of DRAM," the court's actual proximate cause analysis was squarely focused on whether a higher negotiated U.S. DRAM price caused "Sun to pay that price for all the DRAM that it purchased." *See* Dismissal Order, 534 F.Supp.2d at 1115–16. As the court finds herein, however, the answer to this inquiry is no. This is so, despite plaintiff's accurate observation that there is a single global price for artificially inflated DRAM that was negotiated as a result of defendants' conduct.

\* \* \*

In sum, and for all the foregoing reasons, jurisdiction under the FTAIA is lacking over plaintiff's claims, to the extent premised on foreign DRAM purchases made by Sun's foreign subsidiaries. The court accordingly GRANTS defendants' motion to dismiss such claims.[12]

### D. Motion for Summary Judgment Re Purchases from Mitsubishi Entities

Defendants also move for summary adjudication of all plaintiff's claims, to the extent based on purchases from the former defendant Mitsubishi entities [13] worth $420 million. Defendants note that any recovery premised on these purchases first requires proof that Mitsubishi is liable for participating in an anticompetitive conspiracy—something that plaintiff cannot demonstrate. *See Bhan v. NME Hosp., Inc.*, 929 F.2d 1404, 1410 (9th Cir.1991) (to prove section 1 violation, plaintiff must prove the existence of a contract, combination, or conspiracy, among other elements). Specifically, defendants challenge plaintiff's ability to prove either (1) that Mitsubishi itself is guilty of any anticompetitive activity; or (2) that the remaining defen-

---

12. To the extent defendants also seek dismissal of plaintiff's state claims in addition to the Sherman Act claim, the court declines to reach this issue based on nothing more than defendants' cursory footnote (citing two out-of-circuit district cases) suggesting that plaintiff's state law claims are subject to the same FTAIA analysis as is undertaken here.

13. There were originally three defendant Mitsubishi entities named as defendants in the present action: Mitsubishi Electric Corporation, Mitsubishi Electric and Electronics USA, Inc., and Mitsubishi Electric Europe B.V. All, however, were dismissed from the action with prejudice on November 21, 2008, pursuant to a stipulation entered by the parties.

dants' unlawful conspiratorial conduct should otherwise be imputed to Mitsubishi. Not only does this justify summary judgment with respect to plaintiffs federal and state antitrust claims, but defendants also argue that plaintiff's inability to recover from the remaining defendants those overcharges it paid to Mitsubishi, justifies summary judgment with respect to plaintiff's UCL claim as well.

Plaintiff, naturally, resists, responding that not only is there direct evidence of a conspiracy to fix prices by several of the other defendants in the case, but that the circumstantial proof overwhelmingly establishes that it is more likely than not that Mitsubishi participated in the price-fixing conspiracy. Thus, the federal and state antitrust claims must be allowed to proceed. As for plaintiff's UCL claim, plaintiff contends that principles of joint and several liability apply, and save the claim.

Preliminarily, an overview of plaintiff's allegations against defendants—and Mitsubishi specifically—is appropriate. Plaintiff's consolidated complaint alleges that the defendant Mitsubishi entities, along with the other co-defendants in this case, participated in a conspiracy to unreasonably restrain trade, in violation of section 1 of the Sherman Act. See ACC, ¶ 80. Plaintiff also alleges that the conspiracy specifically "consisted of a continuing agreement, understanding and concert of action among defendants and their co-conspirators, the substantial terms of which were to fix, raise maintain and stabilize the prices of, and/or allocate the market for, DRAM sold throughout the world, includ-

ing .the United States." See id. at ¶ 82. As part of the conspiracy, plaintiff contends that defendants participated in meetings and conversations to discuss the price of DRAM; agreed to manipulate prices and supply so as to boost sagging DRAM sales; issued price announcements and price quotations in accordance with the agreements reached by defendants; and sold DRAM to customers throughout the world, including the United States, at non-competitive prices. See id. at ¶ 83.

Turning to the parties' arguments, the court resolves them via consideration of the following: (1) an overview of the legal standards applicable to antitrust conspiracy challenges on summary judgment; (2) the evidence of Mitsubishi's liability for the alleged anticompetitive conduct; and (3) whether, under California's UCL, plaintiff may legally seek recovery against defendants on the basis of DRAM purchases made from Mitsubishi.[14]

### 1. Relevant Section 1 Legal Standards

In order to establish a section 1 violation, plaintiff must prove three elements: the existence of an agreement or conspiracy among two or more separate entities; that unreasonably restrains trade; and which affects commerce. See, e.g., American Ad Mgmt., Inc. v. GTE Corp., 92 F.3d 781, 788 (9th Cir.1996). Plaintiff alleges that Mitsubishi participated in a horizontal price-fixing conspiracy by entering into an agreement with the other defendants to fix the prices and supply for DRAM. It is well established that

---

**14.** Defendants also make the argument that, to the extent plaintiff's evidence of Mitsubishi's participation in the conspiracy relies on conduct committed at a time that plaintiff's experts finds no damages to plaintiff, defendants cannot be liable. This is similar to the argument made by the direct purchaser defendants on summary judgment, which the court rejected. For similar reasons, the court also rejects the argument here. In sum, there is no support for the principle that particular activities of a conspiracy can be excluded from consideration simply because they do not lead to actual damages. Rather, the question in regards to the conspiracy is simply whether plaintiff suffered some damage flowing from the unlawful conspiracy throughout the overall conspiracy period.

such an agreement, if proven, is per se unreasonable. *See, e.g., United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); *see also In re Flat Glass Antitrust Litig.,* 385 F.3d 350 (3d Cir.2004). As noted, the only issue argued by defendants on this motion is the existence of an actual agreement or conspiracy to restrain trade, that includes Mitsubishi.

▆▆▆ With respect to the requirement that plaintiff establish a "contract, combination, or conspiracy"—also referred to as "concerted action"—the legal standards are well-established. All that is required for proof of concerted action is that the alleged parties share a "commitment to a common scheme that has an anticompetitive objective or effect." *See, e.g., Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 768, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984); *United States v. Parke, Davis & Co.,* 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960). The parties' motives need not be identical. *Id.*

One way of proving concerted action is by express agreement. However, a formal contract is not *necessary* to establish collective action. *See, e.g., United States v. Gen. Motors Corp.,* 384 U.S. 127, 142–43, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966). Rather, conspiracies can be shown either by direct *or* circumstantial evidence. Indeed, courts recognize that only "rarely will there be direct evidence of an express agreement" in conspiracy cases. *Local Union No. 189, Amalgamated Meat Cutters v. Jewel Tea Co.,* 381 U.S. 676, 720, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965). Circumstantial evidence as to this element of the offense is, therefor, not only admissible, but often dispositive. The Ninth Circuit has long recognized that "it is not necessary for a plaintiff to show an explicit agreement among defendants in support of a Sherman Act conspiracy," and that concerted action may be inferred "from cir-

cumstantial evidence of [a] defendant's conduct and course of dealings." *See, e.g., Movie 1 & 2,* 909 F.2d 1245, 1251–52 (9th Cir.1990). Here, neither party disputes that plaintiff seeks to prove Mitsubishi's conspiratorial activity only through circumstantial evidence.

As noted, with respect to proof of conspiracy by circumstantial evidence, the Supreme Court has expressly considered this issue in the summary judgment motion context, specifically in the landmark antitrust case, *Matsushita Electric Indus. Co.,* 475 U.S. 574, 106 S.Ct. 1348. There, the court noted that "antitrust law limits the range of permissible inferences from ambiguous evidence in a [section 1] case.... [C]onduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy ... To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of [section] 1 must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently ..... [A plaintiff], in other words, must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed [it]." *See* 475 U.S. at 588, 106 S.Ct. 1348.

The *Matsushita* court identified two separate inquiries that are relevant to the above issue on summary judgment motions: (1) whether the defendant had "any rational motive" to join the alleged conspiracy, and (2) whether the defendant's conduct "was consistent with the defendant's independent interest." *See Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348. The court stated that, "if [the defendants] had no rational motive to conspire, and if [their] conduct is consistent with other, equally plausible explanations, the conduct

does not give rise to an inference of conspiracy." *Id.* at 596–97, 106 S.Ct. 1348.

The Ninth Circuit, once again, has framed this issue in terms of burdens of proof. It has outlined a two-part test to be applied "whenever a plaintiff rests its case entirely on circumstantial evidence. First, the defendant can 'rebut an allegation of conspiracy by showing a plausible and justifiable reason for its conduct that is consistent with proper business practice.'" Second, the burden then "shifts back to the plaintiff to provide specific evidence tending to show that the defendant was not engaging in permissible competitive behavior." *See, e.g., In re Citric Acid Litig.,* 191 F.3d 1090, 1094 (9th Cir. 1999).

The above standards apply as follows here: if defendants come forward with evidence supporting a lack of any agreement or conspiracy to commit unlawful activity by Mitsubishi, they shift the burden to plaintiff to introduce sufficient evidence to warrant the inference of conspiratorial conduct on Mitsubishi's part. With respect to circumstantial evidence, however, the court must consider such evidence in light of the above two-part burden-shifting test espoused by the Ninth Circuit pursuant to *Matsushita*—i.e., if defendants are able to show a plausible and justifiable reason for Mitsubishi's conduct that is consistent with competitive behavior, plaintiff must then provide specific evidence that tends to exclude the possibility of competitive behavior.

### 2. *Evidence of Mitsubishi's Conspiratorial Conduct*

■ As a general preliminary matter, the court finds that defendants' showing is sufficient to shift the burden to plaintiff to introduce evidence that warrants the inference of conspiratorial conduct on Mitsubishi's part. Defendants have pointed, for example, to several of the purported pricing communications in evidence, and noted that many on their face suggest that Mitsubishi did not provide pricing information to any of the defendants; rather, the defendants' OEM customers provided Mitsubishi pricing information—which is perfectly legal. *See, e.g.,* Declaration of Timothy Martin ISO MSJ re Mitsubishi Purchases ("Martin Decl."), Exs. 27, 39, 44. Similarly, defendants note that plaintiff relies on several emails from DRAM suppliers that allegedly include Mitsubishi pricing information, but that the emails never actually state whether Mitsubishi was the source for any pricing information. *See* Martin Decl. at Exs. 17–21, 26, 30–33. Plaintiff also relies on emails that suggest the possibility of past or future exchanges without any indication of when, or whether the past or future exchanges actually occurred. *See id.* at Exs. 16, 25. This, say defendants, cannot demonstrate Mitsubishi's participation in any actual conspiracy. Finally, defendants also comment that the numerous instances of communications about generic market conditions in the DRAM industry—i.e., the general "shop talk" about the industry—also fail to indicate any conspiratorial conduct. *Id.* at Ex. 47; Ex. 49 at 44, 69. *See In re Citric Acid Litig.,* 191 F.3d 1090, 1094 (9th Cir.1999) (general shop talk not actionable as conspiratorial conduct).

Having thus demonstrated that the evidence tends to support an inference of non-conspiratorial conduct, plaintiff must now, in order to defeat summary judgment, come forward with evidence that shows that Mitsubishi was *not* engaging in permissible competitive behavior. *See In re Citric Acid,* 191 F.3d at 1094. In other words, plaintiff must introduce evidence that tends to overcome defendants' plausible explanation and *exclude* the possibility of independent conduct by Mitsubishi, such that an inference of collusion is reasonable.

*See id.* at 1096. Generally, the evidence plaintiff relies on falls into two broad categories of evidence: the factual evidence, and the economic evidence.

Unfortunately for plaintiff, however, this evidentiary showing fails before it even begins. For as defendants correctly note, plaintiff's showing suffers from a fundamental flaw: its inability to distinguish between any of the Mitsubishi entities. Despite having sued three different Mitsubishi entities, for example, plaintiff fails to credit any of the evidence disclosing purportedly anticompetitive communications, actions, or activity by those entities, to any particular entity. This omission is significant. As the court pointed out with respect to the Nanya defendant entities' summary judgment motions in the related *In re DRAM* litigation (and elsewhere herein), it is generally true that a corporate entity's actions cannot be imputed to another corporate entity. Thus, although plaintiff presents circumstantial evidence that may very well suggest conspiratorial activity on the Mitsubishi entities' part, without knowing which to which entity the evidence refers, the court cannot fully evaluate the strength of the evidence as to any particular entity. *See, e.g.*, Declaration of David Cross re Mitsubishi MSJ Opp. ("Cross Mitsubishi Opp. Decl."), Ex. 8 at 73–74; Ex. 13 (communications between and among employees of admitted co-conspirators indicating these defendants had direct communications with Mitsubishi employees about market share and other "competitive inputs."); Ex. 9 at 138–42 (high level employee testimony of meetings with Mitsubishi representatives and other DRAM defendants to discuss general market conditions); Ex. 11 (NEC employee email reporting discussion with Infineon contact, noting that Infineon contact "knows production figures" for Mitsubishi); Ex. 12 (Hynix employee's internal email discussion rumored meeting at which Mitsubishi and other defendants "probably discussed product cut back or something related issues"). Nor, more specifically, can plaintiff raise a disputed issue of fact as to any specific Mitsubishi entity's participation in any allegedly anticompetitive conspiracy.

It should be noted, furthermore, that plaintiff had ample opportunity, through discovery, to legally distinguish each Mitsubishi entity from the other and develop a full record of conduct pertaining to each. Having had this rather obvious opportunity but having failed to avail itself of it, the court can only suppose that plaintiff made a strategic and voluntary decision to blur the corporate lines between the entities— possibly in the hopes that an undifferentiated showing of purportedly actionable conduct might serve to create a picture of culpability greater than the sum of each entity's individual part in the matter.

Whatever the reason, however, the court ultimately concludes that plaintiff cannot meet its burden to defeat summary judgment, since it cannot preliminarily tell the court which entity is responsible for which communication or act. Accordingly, the court hereby GRANTS defendants' motion for summary judgment on the grounds presented herein. In view of this holding, it is unnecessary for the court to consider defendants' arguments with respect to plaintiff's UCL claim.

E. Defendants' Omnibus Motion for Summary Judgment

■ Litigation of a successful antitrust claim requires more than proof of a defendant's antitrust violation. It requires, among other things, that a plaintiff prove what is known as 'injury in fact'—i.e., the fact of harm to plaintiff, caused by the defendant's conduct. *See, e.g., Northwest Publ'ns, Inc. v. Crumb*, 752 F.2d 473, 476 (9th Cir.1985) ("[c]ausal antitrust injury is an essential element of any remedy under

the Sherman Act"). To demonstrate injury in fact, it is "generally sufficient to show with reasonable probability some causal connection between the antitrust violation and [plaintiff's alleged injury]." *Northwest Publ'ns*, 752 F.2d at 476. Significantly, however, in establishing the fact of injury, the antitrust violation need not be the sole cause of the injury, though it must be a material and a substantial cause of the injury. *See Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969) ("It is enough that the illegality is shown to be a material cause of the injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury under § 4"); *Glen Holly Entm't v. Tektronix Inc.*, 343 F.3d 1000 (9th Cir.2003) (plaintiff, who was driven out of the market as a result of defendants' anticompetitive behavior, sufficiently alleged antitrust injury in fact). Where, as here, an antitrust plaintiff alleges a price-fixing conspiracy claim, proof of causal injury therefore requires a showing that plaintiff paid higher prices than it would have paid absent the conspiracy, and that defendants' allegedly anticompetitive conduct was a material cause of plaintiff's higher payments.

■ It is plaintiff's ability to make this showing that defendants challenge. Generally, plaintiff's causation theory is that certain defendants' admittedly unlawful conduct in fixing DRAM prices with respect to six individual OEMs ("Target OEMs") was not only limited to the Target OEMs, but also targeted plaintiff and/or resulted in higher DRAM prices on a market-wide basis, thus injuring plaintiff. For proof of this theory, plaintiff relies on the guilty pleas entered by several co-defen-

dants in a separate criminal DRAM price-fixing case,[15] the expert testimonies of Drs. Marshall and White, and the factual evidence in the record. Defendants do not dispute the viability of plaintiff's causation theory per se, but contend that plaintiff's causation showing falls short of creating a genuine issue of material fact as to whether defendants' alleged conduct actually resulted in the sale of artificially inflated DRAM to plaintiff. Specifically, defendants argue: that neither the pleas nor the factual evidence establishes either that plaintiff was a target of any unlawful price-fixing conspiracy carried out by the defendants during the relevant time frame alleged, or that the conspiracy had market-wide effects; that plaintiff fails to introduce any evidence of an output restraint, the fixing of benchmark prices, or any other mechanism by which defendants' alleged conduct vis-a-vis the Target OEMs could affect market-wide prices; and that, to the extent plaintiff relies on expert testimony to establish causation, that testimony impermissibly substitutes opinion for facts, since it eschews factual analysis of the relationship between defendants' conduct and higher prices market-wide, in favor of unsupported assumptions and observations regarding the DRAM market that only superficially support a finding of impact. Even if plaintiff's causation showing is deemed sufficient, defendants argue that it is nonetheless too remote to allow recovery.

The court's primary mission is relatively straightforward: to determine whether plaintiff has made an adequate showing, for purposes of summary judgment, that defendants' allegedly anticompetitive conduct caused plaintiff to pay artificially high prices for DRAM. Answering this over-

---

**15.** Specifically, defendants Infineon, Hynix, Samsung and Elpida, as well as certain of their employees, pled guilty to participation in a DRAM price-fixing conspiracy that targeted numerous large original equipment manufacturers. *See, e.g.*, Cross Omnibus Opp. Decl., Exs. 1–19.

arching question, however, depends upon evaluation of what the court views as the parties' core underlying sub-theories and arguments: (1) plaintiff's theory that certain defendants' admitted conspiracy to fix the Target OEMs' DRAM prices also directly targeted and raised prices paid by plaintiff; (2) plaintiff's corresponding theory that the admitted conspiracy to fix the Target OEMs' DRAM prices had a market-wide impact on all direct customers' DRAM prices, including those paid by plaintiff; and (3) whether plaintiff's causation arguments are nonetheless too remote to defeat summary judgment.

The court addresses each of the foregoing in turn.

### 1. *Evidence that Defendants Directly Targeted Sun*

Plaintiff asserts that the factual evidence establishes not only the existence of a price-fixing conspiracy with respect to the Target OEMs, but also that defendants more broadly targeted and raised prices directed at plaintiff. For proof, plaintiff points out among other things: that the guilty pleas of Elpida and one of its high level employees, along with that of a high level Samsung employee, expressly identified Sun as a target of the acknowledged conspiracy to fix Target OEM prices; that Samsung (also an acknowledged co-conspirator vis-a-vis the Target OEMs), identified Sun as "Public Enemy Number 1" in 2001; that Samsung's account manager for Sun testified that between 2000 and 2002, he communicated about pricing and price strategy with Sun account managers for Elpida, Hynix and Infineon (again, all of which also pleaded guilty to price-fixing vis-a-vis the Target OEMs) at least once quarterly; and that certain defendants' account managers openly discussed plans to boycott Sun's dynamic bidding events ("DBEs") in December 2001, before ultimately coordinating their bids in advance of Sun's DBE. *See* Declaration of David

Cross re Omnibus Opp. ("Cross Omnibus Opp. Decl."), Ex. 1 at ¶¶ 2, 4(e); Ex. 16 at ¶¶ 2, 4(d); Ex. 18 at ¶¶ 2, 4(d); *see also* Exs. 41, 62, 64, 67–71; Ex. 120 at ¶ 11. Plaintiff also submits evidence that the same sales representatives and managers responsible for Target OEM accounts and pricing, were also responsible for Sun pricing. *See id.* at Exs. 23, 38, 51–56, 81–83. This evidence, says plaintiff—which is also cited by the expert testimony—establishes the likelihood that a reasonable juror would find that defendants' unlawful actions vis-a-vis the Target OEMs targeted as well, and furthermore caused plaintiff to pay higher DRAM prices.

Defendants contest this conclusion, asserting that while this evidence may relate to the presence or absence of a conspiratorial agreement with respect to Sun specifically, it does nothing to actually establish a causal injury—i.e., it does not actually link defendants' conduct to the actual prices paid by plaintiff. Moreover, defendants note that plaintiff's factual evidence all post-dates June 2001—well after the start of the alleged conspiracy periods at issue. Thus, the existence of any impact to plaintiff caused by defendants' allegedly anticompetitive conduct is contradicted by the testimony of plaintiff's own expert, Dr. White, who finds that plaintiff had no damages at all for the vast majority of time beginning June 2001 and ending December 2002, and only limited damages for the small amount of time in which any effect was noted. *See, e.g.*, Supplemental Declaration of Paul Salvaty re Def. Omnibus MSJ ("Salvaty Reply Decl."), Exs. 16–17.

On the whole, the court finds that plaintiff has come forward with sufficient evidence to establish a triable issue of material fact as to whether defendants' allegedly anticompetitive conduct was targeted directly at plaintiff, and caused plaintiff to pay higher prices for DRAM. Defendants

do not dispute, for example, that the guilty pleas in evidence by certain defendants concede both the existence of a conspiracy to fix the price of DRAM with respect to the Target OEMs, and its effectiveness in raising DRAM prices. *See, e.g.,* Cross Omnibus Opp. Decl., Ex. 1 at ¶ 4(d) (admission that Elpida and certain other defendants "reached agreements on price increases and were able to institute price increases on DRAM sales to certain OEMs"). Nor do they dispute, although they seek to lessen the impact of, Elpida's admission that its employees conspired with certain defendants to allocate and divide a bid offered by plaintiff in an auction in March 2002, or that rigged bids were in fact, submitted at plaintiff's auction. *See id.* at ¶ 4(e). Thus there is at least some evidence of a conspiracy by certain defendants to target the price that Sun was to pay for DRAM purchased from defendants during the relevant time period. Furthermore, there is no dispute that some of the same sales representatives and managers who pled guilty to conspiring to raise DRAM prices to Target OEM accounts were also responsible for Sun pricing, and that certain defendants' employees exchanged pricing information relating to DRAM sold to Sun, including the markup over cost amounts. *See, e.g., id.,* Ex. 20 at 83–84; Ex. 38 at 52–54. Nor is there a dispute that Dr. White found that Sun suffered at least *some* overcharges during the alleged conspiracy period. *See* Salvaty Reply Decl., Exs. 16–17. This evidence, combined with Dr. Marshall's testimony comparing and correlating the relationship between Target OEM prices and plaintiff prices (including Sun), creates a plausible inference that defendants' conduct directly targeted Sun in addition to conspiring against the Target OEMs, and was a material cause of higher DRAM prices paid by Sun. *See* Cross Omnibus Opp. Decl, Ex. 24 at 2–6.

To be sure, defendants appropriately emphasized that vagaries and ambiguity exist with respect to plaintiff's evidence, as much of the factual evidence is based on correspondence and deposition testimony that falls short of establishing a firm direct link between defendants' conduct vis-a-vis plaintiff, and higher DRAM prices actually paid by Sun as a result of a particular type of conduct. Defendants also correctly invoke the truism that correlation is not causation, fidelity to which limits the extent to which Dr. Marshall's correlation analysis may, standing alone, satisfy plaintiff's burden. However, to the extent defendants contend that plaintiff's evidence of communications between the parties goes only to the existence of a conspiracy and not to causation, defendants are mistaken. It is true enough that the evidence may come in as part of plaintiff's attempt to prove a conspiracy. Defendants have presented neither persuasive reasoning nor authority, however, as to why this same evidence may not also be submitted to prove that any underlying conspiracy also had an effect on plaintiff.

Moreover, it must be remembered that causation may be demonstrated with circumstantial evidence just as easily as with direct evidence. *See Zenith,* 395 U.S. at 125, 89 S.Ct. 1562 (fact of injury may also be established by inference or circumstantial evidence); *William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.,* 668 F.2d 1014, 1051 (9th Cir.1981). To that end, the court concludes plaintiff has introduced sufficient evidence, albeit of a circumstantial nature, that would allow a reasonable juror to conclude that defendants' allegedly anticompetitive conduct, if proven, resulted in the payment of higher DRAM prices by plaintiff. The issue and the evidence must therefore be presented to the trier of fact.

2. *Evidence that Defendants' Conduct led to Market-wide Price Increases*

In addition to arguing that defendants caused plaintiff to pay higher DRAM prices by directly targeting it as part of defendants' acknowledged conspiracy to fix DRAM prices to Target OEMs, plaintiff also argues that defendants caused plaintiff to pay higher DRAM prices because the Target OEM conspiracy had a market-wide impact on all DRAM purchasers' prices. The foundation for plaintiff's causation arguments is rooted in the expert testimony of plaintiff's causation expert Dr. Marshall, and to a lesser extent, Dr. White, plaintiff's primary damages expert. As a corollary argument, plaintiff notes, however, that the factual evidence also supports Drs. Marshall and White's expert testimony.

The bulk of defendants' motion challenges this expert testimony. Defendants assert that, in order for plaintiff to create a genuine issue of material fact that would allow a jury to determine that defendants' conduct increased DRAM prices on a market-wide basis between August 1998 and June 2002, plaintiff must establish either that defendants restrained DRAM production and output, or that defendants fixed benchmark prices for DRAM. Defendants point out, however, that neither Dr. Marshall's nor Dr. White's testimony analyzes, let alone opines on, the existence of any DRAM output restraints or any agreement to fix benchmark prices for DRAM. Furthermore, their testimony—which defendants claim improperly rests on the guilty pleas instead of any analysis of the factual evidence—is based on broader assumptions than what the evidence can support, and relies on correlation analysis as an improper substitute for actual causation.

Before turning to the sufficiency of plaintiff's evidence, however, the court notes that the parties preliminarily dispute the appropriate legal standard that governs plaintiff's causation showing. Specifically, defendants contend that plaintiff's proof of an industry-wide price impact is legally dependent upon proof of the mechanism through which industry-wide prices can be affected—i.e., evidence of a supply restraint, or evidence that defendants fixed benchmark prices for DRAM. Plaintiff, while not disagreeing that it must link defendants' conduct with an industry-wide impact on DRAM prices, contends that defendants are nonetheless wrong in arguing that the precise mechanism through which such industry-wide impact can be shown is a legal requirement. Thus, while neither party effectively disputes that it is plaintiff's burden to demonstrate that defendants' price-fixing conspiracy actually caused plaintiff to pay higher prices, they do dispute the level of particularity that plaintiff must meet in demonstrating that a causal link is present between defendants' conduct and higher industry-wide DRAM prices paid by plaintiff.

For support of the proposition that plaintiff is legally required to establish a DRAM output reduction or the fixing of benchmark prices, defendants rely on *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n,* 744 F.2d 588 (7th Cir.1984), and *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents,* 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984). None of these cases, however, stands for the proposition that plaintiff must, as part of its legal burden, prove an output restriction or a conspiracy to fix benchmark prices as a necessary prerequisite for demonstrating that defendants' alleged conspiracy had the market-wide effect of raising DRAM prices. Indeed, one of the cases—*Nat'l Collegiate Athletic Ass'n*—suggests the opposite, as it expressly notes in dicta that: "Restrictions on price and output are the paradigmatic *examples* of restraints of trade that the Sherman Act was intended to prohibit." *National Collegiate Athletic Ass'n v.*

*Board of Regents of University of Oklahoma,* 468 U.S. 85, 107, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) (emphasis added).

This is not to say that defendants' arguments miss the mark entirely. For, as their cited cases do show, it is the norm that a price-fixing conspiracy with industry-wide impact would be expected to employ output reductions or benchmark price manipulation as a means for carrying out the overarching conspiracy. This reflects economic truisms, however—the proof of which may or may not help plaintiff establish causation in this case—as opposed to legal requirements. Thus, plaintiff's burden in demonstrating causation continues to be limited to the burden thus far defined by the courts: that of establishing, "with reasonable probability some causal connection between the antitrust violation and [plaintiff's alleged injury]." *Northwest Publ'ns,* 752 F.2d at 476. This is so, even though plaintiff has attempted, as discussed below, to establish defendants' output reduction and/or fixing of benchmark prices at any rate.

The court now turns to the parties' substantive arguments regarding plaintiff's showing. As noted, plaintiff's causation showing rests primarily on the expert testimonies of Drs. Marshall and White, as well as certain factual evidence in the record. A brief summary of both the expert testimony and the evidence is therefore in order, prior to evaluation of both.

*Dr. Marshall.* Dr. Marshall was asked to assume that the defendants engaged in a conspiracy to fix the price of DRAM sold to the Target OEMs, and then to undertake an economic analysis to determine whether the defendants' conspiracy had an effect on the prices of DRAM sold to the plaintiffs. *See* Declaration of Paul B. Salvaty Re Omnibus MSJ ("Salvaty Omnibus Decl."), Ex. 25 at ¶ 12. After reviewing numerous documents and deposition testimony produced in the case, Dr. Marshall opined that the prices paid by the Target OEMs and the plaintiffs moved closely together before, during, and after the defendants' admitted conspiracy, and that four characteristics of the DRAM industry led the Target OEMs' prices, other purchasers' prices, and market-wide prices to move together. *See id.* at ¶¶ 31–32. Those four characteristics are: (a) the standardized nature of DRAM products, (b) the existence of well-established sales channels outside of the defendants' contractual relationships with the Target OEMs (i.e., the spot market for DRAM), (c) the transparency of DRAM prices in the industry (as seen in the multiple public pricing reports frequently published during the relevant time period), and (d) the presence of most favored customer (MFC) clauses that prevented defendants from offering lower DRAM prices to any non-Target OEMs.

Dr. Marshall further opines that the close relationship between the Target OEMs' prices, market-wide prices, and plaintiff's prices is suggested and confirmed by: the evidence of pricing communications amongst the defendants demonstrating the participants' understanding that the Target OEM prices, other firms' prices, and market-wide prices moved together; visual inspection of the prices paid by the Target OEMs and plaintiff (i.e., on a graph); and standard regression analyses which tested the relationship between prices paid by the Target OEMs and prices paid by plaintiff. *See id.* at ¶¶ 33–35; *see also generally* Cross Omnibus Opp. Decl., Ex. 24. Dr. Marshall also opines that, given the foregoing DRAM industry characteristics as a whole, it would have been contrary to defendants' economic incentives to prevent the admitted price increases to the Target OEMs from affecting the plaintiff (else, the Target OEMs could have simply bought cheaper DRAM through the same mechanisms used by

plaintiff to purchase DRAM). *Id.* at ¶¶ 36–37. Based on all this, Dr. Marshall concludes that the defendants' conspiracy affirmatively affected the price of DRAM sold to plaintiff. *Id.*

*Dr. White.* Dr. White was asked to assume that the defendants engaged in a conspiracy to fix the price of DRAM sold to the Target OEMs, and then to undertake an economic analysis to determine the extent to which plaintiffs were overcharged as a result of defendants' conspiracy during two time periods—the period April 1, 1999 through June 15, 2002 (the "plea period") and the period August 1, 1998 through June 15, 2002 (the "conspiracy period") [16]. *See* Salvaty Omnibus Decl., Ex. 2 at ¶ 2. Generally, an overcharge corresponds to the difference between the price purchasers actually paid during a conspiracy period, and the prices they would have paid but for the existence of the conspiracy (i.e., the "but for" prices). Thus, to determine the extent of the plaintiff overcharges here, Dr. White estimated plaintiff's but for prices during the relevant conduct period, and then calculated the plaintiff's damages using the difference between the actual prices paid by plaintiff, and the but for prices that plaintiff would have paid. *See id.* at ¶ 16.

To estimate plaintiff's but for prices, Dr. White performed regression analysis. He used the before and after approach, described as follows. Dr. White analyzed the statistical relationship between actual DRAM prices on the one hand, and real supply/demand and market factors on the other hand that were present in the DRAM industry. *Id.* at ¶ 17. The statistical data were taken from two benchmark periods before and after the conspiracy period. Dr. White then used the statistical relationship between DRAM price and relevant market factors to estimate what the but for prices would have been during the conspiracy period, had DRAM pricing and relevant market factors followed the same relationship during the conspiracy period that they had in the benchmark periods. *Id.* By accounting for the relevant market factors during the alleged conspiracy period, Dr. White opines that any difference between the actual prices during the conspiracy period and the but for prices for the conspiracy period can be directly attributed to the effects of defendants' conduct. *Id.*

Specifically, this before and after approach can be broken down into "three stages." Salvaty Omnibus Decl., Ex. 2 at ¶ 19. First, Dr. White had to determine the impact of the defendants' admitted conspiracy on the prices paid for DRAM chips and modules by the Target OEMs. *Id.* at ¶ 20. To do so, Dr. White used regression analysis to obtain a prediction equation—based on data from the outside benchmark periods only—for the Target OEMs' but for prices during the conspiracy period. The prediction equation allowed Dr. White to arrive at a price index of the Target OEMs' but for prices. *Id.* In the second stage of his analysis, Dr. White estimated the statistical relationship between the DRAM prices actually paid by the plaintiff, and the DRAM prices actually paid by the Target OEMs. *Id.* at ¶ 33. He then used regression analysis to create a price index for the plaintiff that relates the plaintiff's DRAM prices in each month

---

**16.** The primary difference between Dr. Marshall's testimony and Dr. White's testimony is that, while Dr. Marshall was asked to determine *whether* defendants' unlawful conduct had an effect on plaintiff's purchase of DRAM (i.e., caused an injury to plaintiff), Dr. White was asked to determine the actual *extent* of that effect (i.e., the amount of damage). Thus, Dr. Marshall's testimony goes purely to the causation issue, while Dr. White's testimony is primarily directed at the damages issue, but is nonetheless relevant to causation to the extent it necessarily proves the fact of injury.

to the Target OEMs' DRAM prices in the same and nearby months. *Id.* Finally, in the third stage, Dr. White applied the estimated statistical relationship between the Target OEMs' prices and plaintiff's prices (from stage 2) to the Target OEMs' but for price index (from stage 1), in order to obtain plaintiff-specific but for price indexes. *See* Salvaty Omnibus Decl., Ex. 2 at ¶ 34. The resulting difference between the plaintiff's specific but for price, and the actual price paid by plaintiff during the conspiracy period, is the amount of the overcharge caused by defendants' anticompetitive activity (i.e., plaintiff's damage amount). *Id.* at ¶ 35.

For Sun, the results of Dr. White's analysis indicate that Sun's total weighted average overcharge percentage during the conspiracy period was 50%. *Id.* at ¶ 39. This weighted average percentage takes into account the fact that Sun's purchases from the defendants were relatively larger during the months with the highest overcharges. *Id.* Sun's simple non-weighted average overcharge percentage during conspiracy period was 31%. *Id.*

As noted at the outset, defendants attack this expert testimony on three fronts, arguing (1) that neither expert analyzes or even opines whether defendants actually restrained output during the conspiracy period on a market-wide basis; (2) that neither expert analyzes or opines whether defendants fixed benchmark prices so as to affect price on a market-wide basis; and (3) that Dr. Marshall bases his testimony on unfounded assumptions, fails to establish that the market characteristics he identifies actually functioned the way he claims, and that even if Dr. Marshall's theory is credited, it only explains that there is a relationship between the Target OEMs' DRAM prices and plaintiff's DRAM prices—not that defendants' conduct actually caused an increase in plaintiff's DRAM prices. *See,*

e.g., Def. Omnibus MSJ Br. at 13:22–23; 14:9–18 (conspiracy to reduce output necessary to raise market-wide prices); *id.* at 17:8–15; 17:21–23 (alternatively, plaintiff's injury depends on existence of successful conspiracy to raise benchmark prices). For the following reasons, however, the court finds that these arguments fall short of demonstrating plaintiff's inability to establish a genuine dispute of material fact as to causation.

As to defendants' first argument, the court has already noted that plaintiff is not legally required to prove defendants' participation in a supply reduction as an element of causation. As such, and as plaintiff points out, plaintiff's experts cannot be faulted for failing to demonstrate that a supply reduction was the actual mechanism by which industry-wide prices were raised (provided, however, that the experts demonstrate that defendants' conduct was a material cause of plaintiff's injury). Notwithstanding this observation, however, the court finds that plaintiff has, in fact, introduced evidence in support of a supply reduction. Dr. Marshall, for example, does actually opine that, based on his review of the documents and deposition testimony in the case, "defendants engaged in a variety of supply restrictions." *See* Salvaty Omnibus Decl., Ex. 25 at ¶¶ 123–24. Such supply restrictions "include temporary reductions in production and the withholding of inventory from customers." *Id.* In support thereof, Dr. Marshall relies on several email communications among the various defendants purportedly indicating defendants' decisions to reduce output. *See id.* at fn. 155. Furthermore, plaintiff also independently points to the factual evidence in the case, asserting that it corroborates the expert testimony. *See* Cross Omnibus Opp. Decl., Ex. 180 (internal Hynix email); Ex. 176 (handwritten Hynix notes); Ex. 172 (internal Elpida presentation noting that "supply has been re-

duced"); Ex. 174 (Micron email acknowledging "current shortage" due primarily to "capacity utilization in the industry"); Ex. 50 (De Dios testimony noting there are "numerous different ways of adjusting supply to influence price").

Defendants respond to plaintiff's showing by pointing out Dr. Marshall's contradictory testimony stating that he did "not have an opinion regarding the existence of an output restraint in the marketplace." *See* Salvaty Omnibus Decl., Ex. 26 at 200:14–16. They also look to the factual evidence for support, arguing that no supply reduction took place because the defendants expanded output and were operating at 100% of capacity. *See id.* at Exs. 42–43 at 147:1–4, Ex. 45 at 138:17–39:5; Ex. 46 at 136:16–18, Ex. 48 at 74:4–5; see also (Samsung plea). Their expert testimony, too, concludes that no supply restriction took place. *See, e.g., id.,* Ex. 12 at 61–62.

These contrasting views and evidence constitute a disputed issue of fact as to the presence of a supply restriction in the DRAM market carried out by defendants during the alleged time frame. Although defendants take issue with the nature of the documentary evidence cited by Dr. Marshall in his report and point out Dr. Marshall's failure to consider all "other evidence" supporting the lack of a supply restriction in the DRAM marketplace (e.g., actual production data or production decisions), *see* Def. Omnibus MSJ Br. at 14, n. 13, these are challenges that must ultimately be decided by the trier of fact. Notably, defendants have not argued any manifest failure in Dr. Marshall's methodology, or otherwise attacked the admissibility of his opinion.

A similar analysis also applies to defendants' second argument—i.e., that the expert testimony fails to establish causation because it does not opine whether defendants fixed benchmark prices so as to affect a market-wide price increase that injured plaintiff. As a preliminary matter, the court again notes that plaintiff is not, in the first instance, necessarily required to prove the existence of defendants' efforts to fix benchmark prices as a legal element of their claim. However, as is the case with the supply restriction argument, plaintiff nonetheless targets as much. Specifically, Dr. Marshall opines that defendants were able to institute industry-wide price increases by conspiring to raise "spot prices" as a precursor to contract prices, and that combined with the observable characteristics of the DRAM industry (e.g., standardized nature of DRAM, price transparency, well-established sales channels, and the use of most favored customer clauses), it would have been difficult for defendants to raise prices to one set of buyers without raising prices industry-wide—recognition of which in fact led defendants to fix industry-wide prices. *See* Salvaty Omnibus Decl., Ex. 25 at ¶¶ 14–15, 150; *id.* at ¶ 121 (defendants "discussed market-wide prices" and "recognized that they needed to increase spot market prices in order to increase contract prices, and numerous documents also indicate that the defendants coordinated on spot market pricing"); *see also, e.g., id.,* Ex. 25 at ¶¶ 134–165 (discussing characteristics of DRAM industry allowing for spot prices and contract prices to influence industry prices); *see also* Cross Omnibus Opp. Decl., Ex. 120 at ¶ 6; Ex. 133. Plaintiff also argued in its opposition and at the hearing on the motion that the Target OEM prices themselves constituted a "benchmark" price from which plaintiff's prices were derived, a fact further corroborated by the factual evidence, and Dr. Marshall's analysis correlating plaintiff's prices with Target OEM prices. *See, e.g.,* Cross Omnibus Opp. Decl., Ex. 56 at 169:23–170:1 (Hynix admission that "Apple was a benchmark price for [pricing] information for Sun"); Ex. 24 at 64 n. 129; Ex.

25 ("Let's make every effort to make Sun price to be in line with the current price for other MNA customers"); Ex. 38 (admitting that a price increase to IBM would also raise the price at Sun); Ex. 80 ("we are raising sync DRAM price per the changes in price to PC OEM customers").

Defendants respond that Dr. Marshall's testimony that defendants "could not raise the named OEMs' prices without also raising spot market prices" is based on pure conjecture, as it is unsupported by any affirmative evidence of that spot market prices were actually fixed. *See, e.g.*, Salvaty Omnibus Decl., Ex. 25 at ¶ 150. Moreover, to the extent that Sun contends that the Target OEM prices were benchmark prices, defendants note that Dr. Marshall himself expressly disavowed this very theory in his reports. *Id.*, Ex. 24 at ¶¶ 28, 127. As to his views on the characteristics of the DRAM market, defendants also dispute the conclusions he reaches regarding the effect those characteristics had on industry-wide prices. Salvaty Omnibus Decl., Ex. 25 at ¶ 157, Ex. 26 at 221:5–224:22. Dr. Marshall ignores, for example, the fact that most favored customer clauses only required the matching of lower prices for purchases of "like quantities of substantially comparable products." *See* Def. Omnibus MSJ Br. at 24:21–25:6. Sun, however, purchased DRAM that was entirely distinct from the DRAM purchased by the Target OEMs, thereby making it impossible for plaintiff to demonstrate any link between the DRAM prices paid by the Target OEMs and those paid by plaintiff. Salvaty Omnibus Decl., Ex. 10 at Ex. 27; Ex. 12 at ¶¶ 17–19.

As with the supply reduction issue, the court finds that the parties' contrasting arguments and evidence constitute disputed issues of material fact. Although defendants may raise valid challenges to the nature of the evidence underlying the expert opinions regarding the existence of a conspiracy to fix benchmark prices, the jury must have the final say over the weight to be given each party's showing. For purposes of summary judgment, plaintiff has come forward with sufficient circumstantial and expert evidence to create a triable issue of fact as to whether defendants' conduct affected benchmark prices for DRAM which in turn raised prices industry-wide.

Finally, defendants' third argument—i.e., that Dr. Marshall's testimony rests on unfounded assumptions and even if credited, only explains that there is a relationship between the Target OEMs' DRAM prices and plaintiff's DRAM prices, not that defendants' conduct actually caused an increase in plaintiff's DRAM prices—also fails. First, to the extent defendants take issue with the experts' reliance on the conduct admitted by certain defendants in their guilty pleas in 'assuming' the existence of a price-fixing conspiracy aimed at the Target OEMs, rather than independently proving such conduct, the court finds this objection meritless. The guilty pleas are properly in evidence, and the experts are entitled to base their opinions on the facts established therein. To the extent defendants take issue with those facts, they are entitled to dispute them at trial. However, the experts' reliance thereon does not render their testimony objectionable as a matter of law.

Second, defendants' argument fails because, properly read, Dr. Marshall's testimony *does* undertake an explanation for whether and how defendants' price-fixing conspiracy with respect to the Target OEMs could have artificially raised prices on an industry-wide basis. Specifically, Dr. Marshall's testimony opines: that based on a visual understanding of the relationship between DRAM pricing for Target OEMs and plaintiff, and furthermore on the results of regression analyses

that confirm a closely correlated relationship between Target OEM pricing and plaintiff's pricing, and based further on the documents in evidence demonstrating a conspiracy that extended beyond simply the Target OEMs, that DRAM pricing for Target OEMs moved together with plaintiff's DRAM prices; and that, when the nature of the DRAM industry is considered together in conjunction with this closely correlated relationship, it would not have been economically plausible for defendants to restrict their DRAM price-fixing conspiracy to the Target OEMs. Rather, defendants' conspiracy would have affected the entire industry.

This expert testimony warrants presentation to a jury. While defendants correctly note that correlation testimony—relied on heavily by Dr. Marshall—does not equal causation, the court is not persuaded that Dr. Marshall's correlation analysis is employed as a catch-all substitute for causation here. For when taken in conjunction with the totality of all the other evidence submitted by plaintiff, Dr. Marshall's causation theory is supported by more than just the correlation analysis. Defendants, of course, are entitled to cast doubt on the quantity and quality of the testimony and evidence at trial. As a matter of law, however, plaintiff's showing as to causation is not so insufficient as to justify a grant of summary judgment. *See, e.g., Hasbrouck v. Texaco, Inc.,* 842 F.2d 1034, 1042 (9th Cir.1987) ("If there is sufficient evidence in the record to support an inference of causation, the ultimate conclusion as to what the evidence proves is for the jury"); *Perkins v. Standard Oil,* 395 U.S. 642, 648, 89 S.Ct. 1871, 23 L.Ed.2d 599 (1969).

In sum, and although defendants have made a valiant showing to the contrary, the court concludes that plaintiff has come forward with a sufficiently plausible theory—by way of the expert testimony and the circumstantial evidence—to create a triable issue of fact as to whether defendants' conduct vis-a-vis plaintiff and/or the Target OEMs could have raised prices to plaintiff directly or through industry-wide effect.

### 3. *Proximate Cause*

Finally, defendants contend that, even if the court finds that plaintiff has adequately presented a material issue of fact as to causation, plaintiff's theory of causation (and the proof going to it) should still be considered too remote, as a matter of law. After all, defendants note that courts have generally held that not just causation, but proximate causation, is necessary to state a claim for antitrust damages. *See, e.g., Or. Laborers–Employers Health & Welfare Trust Fund v. Philip Morris Inc.,* 185 F.3d 957, 963 (9th Cir.1999). Thus, a direct relationship between the injury and the alleged wrongdoing is required. *See, e.g., Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris Inc.,* 241 F.3d 696, 701 (9th Cir.2001). To that end, the basic problem with plaintiff's theory, say defendants, is that causation here is not based on any price-fixing activity aimed directly at plaintiff but rather is based on the fact that defendants' conspiracy to fix prices to Target OEMs *in turn* caused an increase to plaintiff's prices, which increase was due *in turn* to the market forces affecting prices and the characteristics of the DRAM market. *See* Def. Omnibus MSJ Br. at 29:18–21. This theory depends on the operation of generic market forces rather than defendants' conduct, and furthermore fails to articulate any chain of causation between defendants' conspiracy and plaintiff's injury vis-a-vis these market features. *See id.* at 29:22–27.

Plaintiff, in opposition, does not dispute the proximate causation requirement, but states that proximate causation is satisfied

in price-fixing cases by proof that a plaintiff's prices are affected by a conspiracy, regardless whether the defendants' conduct is directed primarily at a different set of products or customers. This is the case here: plaintiff has demonstrated, through its expert testimony and the evidence, that defendants intentionally communicated with each other in order to artificially inflate plaintiff's prices, kept plaintiff's prices in line with Target OEM prices, and used Target OEM prices either to negotiate higher prices with plaintiff when Target OEM prices increased, or to resist plaintiff's attempts to secure lower prices. Moreover, plaintiff's note that there is nothing in Dr. Marshall's testimony or analysis that suggests that plaintiff's injuries were derivative of the Target OEMs' injuries, or even that plaintiff's pricing was entirely dependent on the pricing decisions for the Target OEMs. Furthermore, plaintiff has submitted evidence demonstrating that it *has* been individually targeted.

Plaintiff has the better argument here. Preliminarily, it is true that proximate causation is required for plaintiff's state antitrust claim under the Cartwright Act (even if not explicitly required as such for plaintiff's Sherman Act claim). Even if proximate causation must be shown, however, plaintiff's causation theory satisfies this standard. Dr. Marshall does not opine, as defendants suggest, that plaintiff's increased price was caused by the Target OEMs' increased price and generic market forces. Rather, Dr. Marshall's testimony is (as noted above) that defendants' conspiracy to raise prices to the Target OEMs actually reached farther than the Target OEMs and encompassed plaintiff, and that proof of the conspiracy's effect on plaintiff is corroborated by the relationship between Target OEM pricing and plaintiff's DRAM pricing over time, as well as the presence of certain factors in the DRAM industry that would have made it economically implausible for the defendants to limit their price-fixing conspiracy solely to the Target OEMs. While the distinction between defendants' characterization of Dr. Marshall's testimony and Dr. Marshall's actual testimony is a subtle one, this does not make it insignificant. It is the difference between a theory that hinges plaintiff's pricing primarily on factors outside defendants' control, and a theory that properly hinges plaintiff's pricing on defendants' actual conduct. Thus, the court views plaintiff's causation theory as one that presents a sufficiently direct causal link between defendants' conduct and plaintiff's injury to pass the proximate cause hurdle.

Furthermore, to the extent that defendants make the passing argument that plaintiff's causation theory is really an impermissible umbrella theory in disguise, the court rejects this contention. The umbrella theory of liability is essentially a "consequential damages theory." *See In re Petroleum Prods. Antitrust Litig.*, 691 F.2d 1335, 1339 (9th Cir.1982). This theory is implicated when a plaintiff seeks recovery from price-fixing defendants, on the basis of purchases that the plaintiff made from *non-conspiring competitors* of the defendants. In essence, the plaintiff pursuing this theory contends that defendants' successful price-fixing conspiracy created a "price umbrella" under which non-conspiring competitors of defendants raise their prices to a level at or near the fixed price set by the conspiring defendants. A successful umbrella liability theory thus seeks to hold price-fixers liable for harm allegedly flowing from their illegal conduct even though the price-fixing defendants received none of the illegal gains and were uninvolved in their competitors' pricing decisions. *See id.*

Many courts, including the Ninth Circuit, have rejected umbrella liability theories. Indeed, in *In re Petroleum Prods.*

*Antitrust Litig.,* the Ninth Circuit held that it had "little hesitance in concluding that the limitations recognized in Illinois Brick bar umbrella claims in the context of the multi-tiered distribution chain alleged" in the case. *Id.* at 1340. The court explicitly reserved judgment, however, as to whether "in a situation involving a single level of distribution, a single class of direct purchasers from non-conspiring competitors of the defendants can assert claims for damages against price-fixing defendants under an umbrella theory." *See id.* at 1340.

Defendants would now have the court step into the opening created by the Ninth Circuit's refusal to consider the umbrella liability theory in situations involving a single level of distribution and a single class of direct purchasers (as is the scenario here), and conclusively decide its legal impropriety. However, aside from the fact that prudence counsels restraint, there is also the fact that defendants' invitation presupposes that an umbrella theory of liability is, in fact, actually being asserted. Yet, as plaintiff points out, this is not the case. Plaintiff is seeking damages based on purchases made from the allegedly conspiring defendants in this case only—*not* based on purchases made from any non-conspiring competitors of defendants. While true that several of the defendants named in Sun's lawsuit were not named in the guilty pleas that affirmatively establish the existence of a price-fixing conspiracy as to the Target OEMs, this has no bearing on the instant action. Plaintiff has sued *all* the named defendants here as co-conspirators who *each* participated in an alleged conspiracy to fix DRAM prices, which conspiracy injured plaintiff. It is up to plaintiff to demonstrate that each defendant did, in fact, participate in such a conspiracy. Nonetheless, plaintiff has not moved on this issue, and it must be reserved for trial. Assuming this conspiracy among each and every named defendant, however, no umbrella theory of liability is even implicated.

Finally, the court disposes of defendants' argument that analysis of certain *AGC* factors also demonstrates that plaintiff's claims are too remote. *See Associated Gen. Contractors v. Cal. State Council of Carpenters,* 459 U.S. 519, 534–35, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) ("*AGC*") (establishing multi-factor test for use in determining antitrust standing). While not totally clear, defendants appear to imply that the *AGC* factors are equivalent to the Ninth Circuit's proximate cause requirement, since they guarantee that an antitrust plaintiff's injuries may not be too remote from defendants' conduct. For reasons already discussed, however, plaintiff raises a material dispute of fact regarding causation and in doing so, also raises a material dispute of fact regarding the directness of plaintiff's injury.

Accordingly, for all the above reasons, the court rejects defendants' arguments that plaintiff's theory of causation fails on remoteness grounds.

\*　　\*　　\*

In sum, defendants have failed to persuade the court that summary judgment as to plaintiff's Sherman Act claim is warranted for lack of causation. As such, defendants' summary judgment motion on this ground is DENIED. Since the analysis for injury and causation is similar for plaintiff's Cartwright Act and Unfair Competition Law claims, and in view of the court's conclusions regarding defendants' proximate causation arguments, defendants' motion is also DENIED with respect to these additional claims. In so ruling, the court also denies defendants' alternative motion for summary adjudication as to limited issues encompassed herein.

## F. Motion to Exclude the Testimony of Dr. Halbert White

 FRE 702 governs the admission of expert opinion testimony. It provides that, where "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue," an expert witness may be called upon to testify accordingly. *See* Fed.R.Evid. 702. Pursuant to the Supreme Court's interpretation of the rule, expert testimony must be both relevant and reliable to be admissible. *See, e.g., Daubert v. Merrell Dow Pharm.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Expert opinion testimony is relevant if the knowledge underlying it has a "valid ... connection to the pertinent inquiry," and it is reliable if the knowledge underlying it "has a reliable basis in the knowledge and experience of [the relevant] discipline." *Daubert,* 509 U.S. at 592, 113 S.Ct. 2786; *Kumho Tire Co.,* 526 U.S. at 149, 119 S.Ct. 1167. Trial courts must exercise reasonable discretion in evaluating and in determining how to evaluate the relevance and reliability of expert opinion testimony.

Defendants here seek to exclude the testimony of plaintiff's damages expert, Dr. White, claiming that Dr. White's testimony falls short of the relevant standard. They make three arguments in this regard: (1) Dr. White's analysis fails to demonstrate that market conditions were the same in the benchmark and cartel periods; (2) Dr. White improperly excludes from consideration any factors that were under defendants' control (e.g., supply and demand factors, capacity utilization); and (3) Dr. White's methodology is unreliable.

Preliminarily, a brief review of Dr. White's testimony is in order. As noted in connection with defendants' omnibus motion for summary judgment regarding causation, Dr. White is charged by plaintiff with establishing the extent to which all the opt-out plaintiffs were overcharged as a result of defendants' conspiracy. Generally, Dr. White opines that a market-wide conspiracy resulted in overcharges as high as 50% to plaintiffs, between August 1998 and June 2002. To do this, he first assumes the existence of the conspiracy set forth in the plea agreements, with the exception of the conspiracy's start date, which Dr. White assumes was either April 1, 1999 or August 1, 1998. Then he employs a three step process. First, Dr. White measures the impact of the alleged conspiracy on the prices paid for DRAM chips and modules by the Target OEMs. To do so, Dr. White uses regression analysis to obtain a prediction equation (based on DRAM sales and price data during the benchmark periods) for the Target OEMs' but for prices during the conspiracy period. The prediction equation is what allows Dr. White to arrive at a price index of the Target OEMs' but for prices. Second, Dr. White estimates the statistical relationship between the DRAM prices actually paid by the plaintiff, and the DRAM prices actually paid by the Target OEMs. Specifically, he uses regression analysis to create a price index for the plaintiff that relates the plaintiff's DRAM prices in each month to the Target OEMs' DRAM prices in the same and nearby months. Finally, Dr. White applies this estimated statistical relationship between the Target OEMs' prices and plaintiff's prices to the Target OEMs' but for price index (from step 1), in order to obtain plaintiff-specific but for prices.

 Defendants first contend that Dr. White's analysis fails to demonstrate that market conditions were the same in the benchmark and cartel periods. Defendants' argument is premised on Ninth Circuit authority, which defendants claim

holds that use of a "before and after" approach to determining damages requires "some showing that the market conditions in the two periods were similar but for the impact of the violation." *See, e.g., Pacific Coast Agricultural Export Ass'n v. Sunkist Growers, Inc.,* 526 F.2d 1196 (9th Cir. 1975) ("Plaintiffs' method of measuring damages, known as the 'before and after' theory, may be used only where there has been some showing that the market conditions in the two periods were similar but for the impact of the violation"); *see also* Areeda & Hovenkamp, Antitrust Law at 384–85 (requiring that changes in market conditions between the benchmark and conspiracy periods must be "taken into account in estimating the 'but for' prices during the conspiracy period' "). In contravention of this requirement, argue defendants, Dr. White assumes rather than proves that market conditions were comparable during the benchmark and conspiracy periods, despite the fact that Dr. White himself concedes that the DRAM industry was more competitive and less competitive at times. *See* Declaration of Joshua Stambaugh re Motion to Exclude ("Stambaugh Decl."), Ex. 8 at ¶¶ 272–73; Ex. 21 at 78–79.

Generally, defendants have correctly cited Ninth Circuit authority holding that, where the before and after approach is undertaken, an expert must account for differences in market conditions when measuring damages across benchmark and conspiracy periods. *See Pacific Coast,* 526 F.2d 1196. However, plaintiff has also correctly noted that neither the cases relied on by defendants, nor Areeda & Hovenkamp, stated as much in connection with a "reduced form price equation" specifically—which is what Dr. White employs here through use of his "prediction equation." In a reduced form price equation, price is "expressed as a function of supply and demand variables." And as plaintiff points out, where this type of multiple

regression analysis is used, "plaintiff has controlled for changes in demand and supply determinants of price, and the resulting prediction on price during the conspiracy period takes into account influences other than the conspiracy that could serve to increase the ... prices." *See* Areeda & Hovenkamp at 386. Thus, to the extent Dr. White's prediction equation takes supply and demand variables into account as a function of price, it is acceptable.

More importantly, plaintiff correctly points to several examples in which Dr. White's testimony does, in fact, take market conditions between the benchmark and conspiracy periods into account. Dr. White's analysis uses several production indices related to end products for DRAM (e.g., end products reflect production issues), and furthermore includes several variables related to the underlying costs of manufacturing DRAM. *See* Stambaugh Decl., Ex. 1 at ¶¶ 216–17; Ex. 2, Appendix E. In addition, Dr. White undertook a separate study of exogenous factors—e.g., boom and bust cycles, earthquakes, other production influences—in his rebuttal report, precisely in order to answer defendants' criticisms on this point. Even after undertaking this alternative analysis, Dr. White found that the alternative analysis verified his own initial results. *See id.* at Ex. 1 at ¶ 218; Ex. 1 at Appendix G at ¶¶ 355–81.

In sum, the law suggests that it is permissible for Dr. White to use a reduced form price equation, which expresses price as a function of supply and demand, in order to control for changes in market conditions. And significantly, Dr. White's initial analysis and the rebuttal analysis both indicate that Dr. White has actually attempted to control for certain changes in market conditions. Thus, to the extent that defendants challenge the accuracy or propriety of these variables, it is an issue

that goes to the weight, rather than the admissibility, of Dr. White's testimony.

██ Defendants' second argument in support of exclusion centers on Dr. White's purported failure to consider any factors that were under defendants' control. According to defendants, Dr. White assumes the conspiracy admitted by certain defendants, and leaps from there to a model in which *all* of defendants' conduct—including unilateral decisions related to output, for example—is presumed to be tainted by the conspiracy. In doing so, say defendants, Dr. White erroneously lumps together legal and illegal conduct. *See Vernon v. Southern Cal. Edison Co.*, 955 F.2d 1361, 1371 (9th Cir.1992) (exclusion appropriate where damages study fails to distinguish between legal and illegal conduct). Indeed, defendants note that their own experts and witnesses have introduced testimony that numerous changes in capacity, yield and market conditions arising during the conduct period were responsible for any restrictions in output—not any conspiratorial conduct. Yet, Dr. White admits that he attributes any impact or changes in output to the conspiracy, and not to any other sources. This failure to make allowance for unilateral decisions affecting DRAM supply and prices, warrants exclusion.

Without challenging the legal principle that legal and illegal conduct should not be lumped together, plaintiff responds that defendants' criticisms do not go to the admissibility of Dr. White's testimony, merely the weight. After all, the court in *In re Linerboard* considered and rejected the very same argument that defendants are making here, and admitted Dr. White's same methodology. *See In re Linerboard Antitrust Litig.*, 497 F.Supp.2d 666 (E.D.Pa.2007).

The court agrees with plaintiff on this point. Several economic studies support the argument that, in order to generate a reliable set of plaintiff but for prices, experts should not include any factors that were themselves tainted by the conspiracy. *See* Pl. Opp. BR. Re Dr. White's Testimony at 12:4–8. Hence, Dr. White purported to omit the factors under the conspirators' control, so as to exclude any effects of the conspiracy itself in generating plaintiff's but for prices. This seems reasonable. It is also not the same as improperly *including* both legal and illegal conduct. Rather, Dr. White's analysis simply takes out all of defendants' conduct altogether. Moreover, while not controlling, it is at least instructive that the *In re Linerboard* court allowed Dr. White's testimony to come in over the precise same argument that defendants are making here. And finally, while defendants may have very valid points regarding the importance of outside influences—like changes in capacity and market conditions—in raising prices (thereby leading to the conclusion that defendants have not caused an industry-wide conspiracy at all), these are points that go to the weight, and not the admissibility of Dr. White's testimony. Accordingly, the court rejects defendants' second argument in support of exclusion.

Finally, the court reaches the same conclusion with respect to defendants' third and final argument in support of exclusion—i.e., that Dr. White's second step, in which he uses the Target OEM but for prices to predict plaintiff's but for prices, is unreliable and inadmissible. Defendants' primary objection to the reliability of Dr. White's analysis seems to be that Dr. White's second step generates huge damages to plaintiff even when the conspiracy had no effect on the Target OEMs' prices. This is nonsensical enough, say defendants, to lead to exclusion. Moreover, defendants note that Dr. White's second step finds no support among accepted methodologies and conflicts with what Dr.

White himself states is the generally accepted approach.

Defendants' arguments are interesting, but not necessarily grounds for exclusion. The gist of their argument is that Dr. White should have predicted plaintiff's but for prices directly, rather than using the Target OEMs' but for prices to generate the plaintiff's but for prices (based on his analysis of the relationship between Target OEM prices and plaintiff prices). If Dr. White had simply repeated his first step—which *is* generally accepted—in order to directly estimate plaintiff's but for prices, defendants note that plaintiff would have ended up with huge undercharges for plaintiff, not overcharges. Even if defendants are right, however, this is the type of criticism that goes to the weight of Dr. White's testimony. This is because defendants do not do enough to demonstrate that Dr. White's second step is unreliable, or otherwise totally at odds with the scientific literature. Plaintiff submits, for example, citations to several instances in which a two step forecasting method has been used, even when a single step approach was available. According to these citations, the two step forecasting method has been used to predict international countries' growth rates, real interest rates, GDP rates, as well as other economic factors. *See* Declaration of David Cross re Dr. White Opp. ("Cross Exclusion Opp. Decl."), Exs. 20–24. Furthermore, plaintiff has also pointed to case law where similar two-step forecasting methods in the antitrust context specifically was admitted—the *In re Linerboard* and *In re Vitamins Antitrust Litig.* cases. *See id.* at Exs. 25, 34. While these cases, as noted before, are not controlling, they are instructive.

Moreover, there is the additional point that Dr. White's use of the two step method was undertaken with the specific intent and belief that this method, under the facts of this case, is "the most reliable way to obtain the but-for price estimates" for plaintiff. *See id.* at Ex. 4 at 64. Thus, Dr. White's use of the second step, far from being undertaken in some unscientific manner, is explained as a means of *increasing* reliability. While defendants may understandably attack this method as one that decreases reliability, such an attack goes to the weight, and not the admissibility of the approach.

It should also be noted that those cases that *do* hold experts' econometrics analyses inadmissible are limited to cases in which the expert had blatant failures in methodology—e.g., they ran only simple regressions rather than complex regressions, or totally omitted to include supply and demand factors as part of the methodology. *See, e.g., In re Methionine Antitrust Litig.,* 2003 WL 22048232 (N.D.Cal. 2003) (expert failed to run multiple regressions). None of these deficiencies is evident here.

Finally, it is also worth mentioning, as plaintiff points out, that Dr. White conducted ten alternative methods of analysis, in response to defendants' criticisms of Dr. White's initial analysis. All of them corroborate Dr. White's initial analysis. Defendants' challenges to these are fairly generic, and generally are predicated upon the principle that Dr. White's recourse to alternative analyses still does not demonstrate that his initial analysis is valid. However, to the extent these additional analyses tend to corroborate Dr. White's initial testimony, they support a finding of reliability.

In sum, defendants have presented no arguments that establish sufficient grounds for outright exclusion of Dr. White's testimony. While they may have raised valid criticisms and concerns with respect to Dr. White's analysis, these are all criticisms and concerns that go to the

testimony's weight and not its admissibility. Plaintiff, moreover, has done an acceptable job of demonstrating that Dr. White's analysis is based on reliable principles and methodologies.

Defendants' motion to exclude the expert testimony of Dr. White is accordingly DENIED.

## G. Evidentiary Objections

Defendants have filed numerous evidentiary objections in connection with each motion discussed herein, asserting several conceivable grounds (hearsay, lack of foundation and/or authentication, relevance, etc.) for objection wherever possible. In addition, defendants filed a motion to strike in response to *plaintiff*'s response to defendants' evidentiary objections regarding their motion to exclude the testimony of Dr. Halbert White. In view of the sheer number of objections at issue, the court declines to review each and every exhibit as a matter of course. Rather, the court has reviewed defendants' objections—and plaintiff's response thereto—in connection with those exhibits that the court has actually relied upon in its analysis and decision.

As a preliminary matter, the court notes that many of defendants' objections are overly broad. In particular, while having objected to a majority of exhibits on hearsay grounds, defendants have largely failed to detail the actual statements that purportedly qualify as hearsay. As plaintiff points out, this is a deficiency that makes it difficult, if not impossible, for the court to assess defendants' hearsay objections—and any potential hearsay objections—at this stage. To the extent that defendants have also objected to plaintiff's exhibits on grounds of relevance and lack of foundation and/or authentication, the court has also found the objections unpersuasive with respect to the exhibits relied

on by the court for the purposes of this order.

With this in mind, the court hereby OVERRULES defendants' objections to certain exhibits, as follows:

(a) defendants' objections to Exhibits 12–13, 18–19, 28, 37–39, 53, and 74 of the Cross Declaration, submitted in support of Sun's opposition to defendants' motion for partial summary judgment as to external manufacturer purchases, are OVERRULED;

(b) defendants' objections to Exhibits 3, 5, and 10–11 of the Cross Declaration submitted in support of plaintiff's opposition to the motion to dismiss certain claims for lack of subject matter jurisdiction under the FTAIA, are OVERRULED;

(c) defendants' objections to Exhibits 11–3 of the Cross Declaration submitted in opposition to defendants' motion for summary judgment based on purchases from Mitsubishi entities, are OVERRULED;

(d) defendants' objections to Exhibits 1–19, 20, 23–25, 38, 41, 5–56, 62, 64, 67–71, 80–83, 120, 172, 174, 176, and 180 of the Cross Declaration in support of Sun's opposition to defendants' motion for summary judgment and, in the alternative, summary adjudication, are OVERRULED; and

(e) defendants' objections to Exhibits 8–25 and 26–34 of the Cross Declaration submitted in opposition to defendants' motion to exclude the testimony of Dr. Halbert White are OVERRULED.

To the extent, however, that defendants have additionally filed a motion to strike the supplemental declaration of Dr. White that was submitted in connection with plaintiff's response to defendants' evidentiary objections, the motion to strike is GRANTED, as the filing of that supplemental declaration violates the deadline for

completing expert discovery that was imposed in this case.

Finally, as intimated above, to the extent defendants have made evidentiary objections to exhibits not relied on by the court herein, the court declines to rule on the admissibility of those exhibits. The parties remain free to raise any objections thereto at trial, if necessary.

### H. Requests for Judicial Notice

Both sides have filed requests for judicial notice of various unrelated court decisions. *See* Plaintiffs' Request for Judicial Notice Regarding Case Materials from in re Vitamins and In re Linerboard; *see also* Defendants' Request for Judicial Notice ISO Motion to Exclude the Testimony of Plaintiffs' Expert Witness Halbert White.

The court hereby GRANTS both sides' requests for judicial notice, as it finds that the documents for which each party seeks judicial notice present a proper basis for such a request, pursuant to Federal Rule of Evidence 201.

### I. Conclusion

For all the foregoing reasons, the court hereby GRANTS summary judgment in part and DENIES summary judgment in part, as follows: (1) defendants' motion for partial summary judgment as to Sun's claims based on purchases made by Sun's external manufacturers is GRANTED; (2) defendants' motion for summary judgment as to Sun's claims based on purchases of DRAM from defendant Mitsubishi entities is GRANTED; and (3) defendants' omnibus motion for summary judgment or in the alternative, for summary adjudication, is DENIED. The court furthermore GRANTS defendants' renewed motion to dismiss certain of Sun's claims for lack of subject matter jurisdiction, to the extent based on foreign DRAM purchases, and DENIES defendants' motion to exclude

the expert testimony of plaintiff's expert, Dr. Halbert White.

**IT IS SO ORDERED.**